*CORRECTED*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| FUJIAN YINFENG IMP & EXP TRADING CO., LTD., <br>        Plaintiff, <br> v. <br><br> UNITED STATES, <br>        Defendant, <br>   and <br><br> COALITION OF AMERICAN MILLWORK PRODUCERS, <br>        Defendant-Intervenor. | ) <br> ) <br> ) <br> ) <br> ) <br> )    Court No. 21-0088 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: August 17, 2021

TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT ................................................................ 1

        A.      Administrative Determination Subject to Appeal.............. 1

        B.      Issues Presented ............................................. 1

II.     STANDARDS OF REVIEW ............................................................ 2

III.    ARGUMENT ................................................................ 5

        A.      The Department's Application of The EBC Countervailing
                Duty Program to Yinfeng Is Unsupported By Record
                Evidence And Contrary to Law........................................... 5

        B.      The Department Unlawfully Expanded the Primer for
                LTAR Program .......................................................19

        C.      The Department's Ocean Freight Benchmark is Not
                Supported by Substantial Evidence ...................................30

        D.      The Department Should Rely Upon the Contemporaneous
                Land Benchmark.....................................................34

IV.     Conclusion and Prayer for Relief.................................................40

## CASES

*Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333 (Ct. Int'l Trade 2006) ........................................................................................ 5

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) .................................................................................................. 3, 24

*Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) ............................................................................ 32

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ................................ 32

*Canadian Solar, Inc. v. United States*, 2020 Ct. Intl. Trade LEXIS 24; SLIP OP. 2020-23 (Feb. 25, 2020) ..............................................11-12

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade  2018) ................................................11-12, 15-16

*Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-137 (Nov. 8, 2019) ................11-12, 16

*Changzhou Trina Solar Energy Co. v. United States*, 2018 Ct. Intl. Trade LEXIS 179; SLIP OP. 2018-167 (Nov. 30, 2018) .....................11-12

*Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-143 (Nov. 18, 2019) .....................11-12

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade  2019) ......................................................................................... 10

*Clearon Corp. v. United States*, 2020 Ct. Intl. Trade LEXIS 149 (Oct. 8, 2019) .............................................................................................. 10

*Consol. Bearings Co. v. United States*, 348 F.3d 997  (Fed. Cir. 2003) ................................................................................................ 4, 38

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938)............ 3

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983) ........................................................................................ 3

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) .................................................................. 14-15

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ....... 4

*Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) .................................................................. 11

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1402 (Ct. Int'l Trade  2019) .............................................................. 11, 13

*Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade  2019) .................................................................. 11

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335 (Ct. Int'l Trade, 2019) .................................................................. 11

*Guizhou Tyre Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 86; Slip Op. 2020-81 (June 5, 2020) ....................................... 11

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade  2019) ......................... 12, 17-18

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 41, SLIP OP. 2020-39 (Mar. 24, 2020) .......... 12, 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................................................... 4-5

*Mueller Commercial de Mex., S. de R.L. de C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ...................................... 6

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ..... 6

*Shandong Rongxin Imp. & Exp. Co. v. United States,* 163 F. Supp. 3d 1249  (Ct. Int'l Trade 2016) ................................. 3, 24

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ....... 4, 38

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...................... 2-4

*Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341
(Ct. Int'l Trade  2019) ............................................................... 12

## STATUTES & REGULATIONS

19 U.S.C. § 1516a(b)(1) ............................................................ 2-4

19 U.S.C. 1671a ....................................................................... 28

19 U.S.C. § 1677e .................................................................... 6-8

19 U.S.C. § 1677(5)(E) ........................................................... 33-35

19 C.F.R. 351.301(2)(iv) ............................................................ 28

## ADMINISTRATIVE DECISIONS

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled
Into Modules, From the People's Republic of China: Preliminary
Results of Antidumping Duty Administrative Review and
Preliminary Determination of No Shipments; 2017–2018*, 85 Fed.
Reg. 7531 (February 10, 2020) ................................................. 36

*Fine Denier Polyester Staple Fiber From the People's Republic of
China: Preliminary Affirmative Countervailing Duty
Determination*, 82 Fed. Reg. 51,396 (November 6, 2017) ....................... 29

*Wood Mouldings and Millwork Products From the People's Republic
of China: Preliminary Affirmative Determination of Sales at Less
Than Fair Value, Postponement of Final Determination, and
Extension of Provisional Measures,* 85 Fed. Reg. 48669 (August 12,
2020) ........................................................................................ 36

# GLOSSARY

Adverse Facts Available .......................................................................AFA

China Ex-Im Bank's Export Buyer's
Credit Program ......................................................EBCP or EBC program

Coldwell Banker Richard Ellis Group ........................................... CBRE

Government of China .......................................................................... GOC

Harmonized Tariff Schedule ............................................................. HTS

Less Than Adequate Remuneration ................................................LTAR

Malaysian Investment Development Authority............................. MIDA

New Subsidy Allegation ......................................................................NSA

## I.    RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Fujian Yinfeng Imp & Exp Trading Co., Ltd., ("Yinfeng" or "Plaintiff"), hereby states the administrative decision subject to appeal and the issues of law presented:

### A.    Administrative Determinations Subject to Appeal

The U.S. Department of Commerce (the "Department") published the contested final determination in the Federal Register on January 4, 2021 and the countervailing order was published on February 16, 2021. *See Wood Mouldings and Millwork Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 FR 67 (January 4, 2021) ("Final Determination"), **Appx001394**, *incorporating* Issues and Decision Memorandum ("IDM")*,* **Appx001000**; *see also Wood Mouldings and Millwork Products From the People's Republic of China: Countervailing Duty Order*, 86 Fed. Reg. 9,484 (February 16, 2021) **Appx001398**.

### B.    Issues Presented

1.    Issue One:  Whether the Department's application of adverse facts available ("AFA") to the China Ex-Im Bank's Export Buyer's Credit Program ("EBC" program or "EBCP") against the mandatory

respondents after they demonstrated non-use of the EBCP is supported by substantial evidence or otherwise contrary to the law?

2.    <u>Issue Two</u>: Whether the Department's expansion of the primer and gesso at LTAR program to include purchases of the raw material used to produce gesso is supported by substantial evidence and is not in accordance with the law?

3.    <u>Issue Three</u>:  Whether the Department's selection of the ocean freight benchmark for the wood LTAR programs is supported by substantial evidence or otherwise in accordance with the law?

4.    <u>Issue Four</u>: Whether the Department's selection of the land benchmark is supported by substantial evidence or is otherwise in accordance with the law?

## II.    STANDARDS OF REVIEW

The Court will only sustain the Department's factual determination if it is based on substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*,

340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).   Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 6 C.I.T. 155, 161, 572 F. Supp. 883, 888 (1983) (quoting *Universal Camera*, 340 U.S. at 488). Moreover, "Commerce's determination cannot be based on isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *Shandong Rongxin Imp. & Exp. Co. v. United States,* 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016) (internal citation omitted). The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'"   *Gerald Metals, Inc. v. United*

3

*States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting *Universal Camera*, 340 U.S. at 487).

Further, the Court will also hold as unlawful any administrative decision that is arbitrary, capricious, or an abuse of discretion. *See* 19 U.S.C. § 1516a(b)(l)(A). Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Department acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration, quotation marks and

4

citation omitted).  An agency "must cogently explain why it has

exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463

U.S. at 48 (citations omitted).  Internal inconsistency and self-

contradiction do not satisfy this requirement.  Indeed, a "principal

justification for the administrative state is that in 'area[s] of limitless

factual variations, like cases will be treated alike.'" *Anderson v. U.S.*

*Sec'y of Agric.*, 30 C.I.T. 1742, 462 F. Supp. 2d 1333, 1339 (2006)

(internal citation omitted) ("Courts will therefore not defer to an agency

regulation or adjudicative decision when they produce results which are

arbitrary, capricious, or manifestly contrary to the statutory scheme.").

Thus, when the administering agency treats similarly situated parties

differently or fails to consider an important aspect of a problem, its

decisions are arbitrary and capricious and subject to reversal.

## III.  ARGUMENT

### A.  The Department's Application of The EBC Countervailing Duty Program to Yinfeng Is Unsupported By Record Evidence And Contrary to Law.

The Department's use of adverse facts available ("AFA") to find

that Yinfeng benefitted from the EBC program when record evidence

only contains evidence of non-use is unreasonable and unlawful.  The

Federal Circuit has described the application of AFA as a two-part inquiry.  First, the Department must identify why it needs to rely on facts otherwise available, and second, the Department must show how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting from the facts otherwise available."  *See* 19 U.S.C. § 1677e(b); *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1381 (Fed. Cir. 2003)  ("{T}he legislative history mirrors the language in the statute by recognizing that: (1) the Department must use facts otherwise available when requested information is missing and (2) the Department may impose an adverse inference after determining that a respondent has not been fully cooperative or has failed to act to the best of its ability in gathering information."); *Mueller Commercial de Mex., S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1231-32 (Fed. Cir. 2014) (quoting *Nippon Steel*, 337 F.3d at 1381).  The Department is allowed to use facts available only when "necessary information is not available on the record," or an interested party has withheld requested information, significantly impeded the investigation, or provided unverifiable information.  19 U.S.C. § 1677e(a).  As such, the Department must first

6

establish its authority to act under Section 1677e(a) before it can properly invoke Section 1677e(b) and apply AFA.

In its Final Determination, the Department cited 19 U.S.C. §§ 1677e(a)(1), (a)(2)(A), and (a)(2)(C), claiming that because the GOC failed to provide the 2013 Revisions and a list of all the partner banks involved in the disbursement of funds under the EBC program, necessary information is missing from the record and that the Department was unable to verify Yinfeng's non-use of the EBC program. Final IDM at **Appx001029** ("Commerce must rely on the facts otherwise available, pursuant to Sections 776(a)(1), (a)(2)(A), and (a)(2)(C) of the Act. Specifically, necessary information is not on the record because the GOC withheld information that we requested that was reasonably available to it, which significantly impeded the proceeding.").[1] Although the Department did not expressly invoke 19

---

[1] 19 U.S.C. § 1677e(a) reads:
   (a) **In general** if –
      (1) necessary information is not available on the record, or
      (2) an interested party or any other person –
         (A) withholds information that has been request by the administering authority or the Commission under this subtitle,
         (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
         (C) significantly impedes a proceeding under this subtitle, or

7

U.S.C. § 1677e(a)(2)(D) by rejecting Yinfeng's and its customers'

statements of non-use as unverifiable, the Department expends a

considerable amount of its analysis on how it could not verify that

respondents or their customers did not use the EBC program.  Final

IDM at **Appx001027-001029**.  Therefore, the Department is in fact, for

the most part of its analysis, relying on Section 1677e(a)(2)(D).

Specifically, the Department found that EBC loans can potentially

be distributed to the importer's account from a partner bank of the

China Ex-Im Bank, and then from there be sent to the exporter's bank

account.  *See* Final IDM at **Appx001022-001023**.  The Department

argued that "performing the verification steps to make a determination

of whether the 'manufacture, production, or export' of the company

respondents' merchandise has been subsidized would therefore require

knowing the names of the intermediary banks; it would be their names,

not the name 'China Ex-Im Bank,' that would appear in the subledgers

of the U.S. customers if they received the credits."  Final IDM at

---

　　　　　　　　(D) provides such information but the information cannot be verified as
　　　　　　　　provided in section 1677m(i) of this title,
the administering authority and the Commission shall, subject to section 1677m(d)
of this title, use the facts otherwise available in reaching the applicable
determination under this subtitle.

**Appx001024**.  Therefore, the Department continued to find that the GOC withheld necessary information, and, as AFA, that Yinfeng used and benefited from the EBC program.

The decision to apply an adverse inference to the GOC and further to Yinfeng because of GOC's failure to submit the 2013 revisions and a list of partner banks is unsupported by substantial evidence.  As summarized above, Yinfeng responded that it has never applied for any EBC loans for itself or assisted its customers to apply for such loans.  In addition, Yinfeng provided customer declarations of non-use from every single U.S. customer to whom they exported during the POI.  *See* Yinfeng's Sec. III Qre. Resp. (April 13, 2020) at **Appx005359-005361, Appx005528-005541**.  Additionally, the GOC corroborated Yinfeng's and its customers' non-use by searching the customers' names in China Ex-Im Bank's loan database.  *See* GOC's Sec. II Qre. Resp. (April 13, 2020) at **Appx005960-005964** (Apr. 13, 2020); GOC's Supp. Sec. II Qre. Resp. at $3-7$ (May 15, 2020) at **Appx011276-011280**.

Record evidence thus establishes that Yinfeng and its customers did not use or benefit from the EBC program.  Indeed, the Department does not point to any evidence to the contrary; instead, the Department

9

claims that it needs a complete understanding of how the program is run in order to verify the non-use of the program.  Final IDM at **Appx001023-001028**.  The Department's bare-bone assertion cannot be sustained.  *See Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1359 (Ct. Int'l Trade 2019) ("It is important to keep in mind that a determination concerning the presence or absence of a subsidy revolves around whether 'the manufacture, production, or export' of particular 'merchandise' has been subsidized. Thus, a determination as to whether the use of facts available or adverse facts available is lawful depends on whether the information missing from the record relates to the 'manufacture, production, or export' of that 'merchandise.' If it does not, the information is not 'necessary' and so the application of neither facts available nor adverse facts available is lawful.") (internal citation omitted).

The Court of International Trade has in many instances held that the China Ex-Im Bank's 2013 revision and a list of the third-party banks involved in disbursing the EBC funds do not create a "gap" on the record that warrants the application of AFA.  *See Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 – 71 (Ct. Int'l Trade 2018)

("Although GOC failed to fully respond to the Department's request for
information, this failure did not create the requisite gap needed to make
an adverse inference.") (*OTR Tires from China* POR 2014 first opinion);
*see e.g., Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346 (Ct.
Int'l Trade  2019) (*OTR Tires from China* POR 2014 remand opinion);
*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1402 (Ct. Int'l Trade
2019) (*OTR Tires from China* POR 2014 second remand opinion);
*Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade
2019) (*OTR Tires from China* POR 2015 first opinion); *Guizhou Tyre Co.
v. United States*, 415 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) (*OTR Tires
from China* POR 2015 remand opinion); *Guizhou Tyre Co. v. United
States*, 2020 Ct. Intl. Trade LEXIS 86; Slip Op. 2020-81 (June 5, 2020)
(*OTR Tires from China* POR 2015 second remand opinion); *Changzhou
Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312 (Ct. Int'l
Trade 2017) ("*Changzhou I*"); *Changzhou Trina Solar Energy Co. v.
United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) (*Solar Cells
from China* POR 2014 first opinion; "*Changzhou Trina II*"); *Changzhou
Trina Solar Energy Co. v. United States*, 2018 Ct. Intl. Trade LEXIS
179; SLIP OP. 2018-167 (Nov. 30, 2018) (*Solar Products from China*

POR 2014-15 first opinion; "*Changzhou Trina III*"); *Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-137 (Nov. 8, 2019) (*Solar Cells from China* POR 2014 remand opinion; "*Changzhou Trina IV*"); *Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 144; SLIP OP. 2019-143 (Nov. 18, 2019) (*Solar Products from China* POR 2014-15 remand opinion; "*Changzhou Trina V*"); *Canadian Solar, Inc. v. United States*, 2020 Ct. Intl. Trade LEXIS 24; SLIP OP. 2020-23 (Feb. 25, 2020) (*Solar Cells from China* POR 2015, granting the Department's request for voluntary remand to reevaluate the AFA application on the EBC program); *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) (*Chlorinated Isos from China* POR 2014 first opinion); *Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade  2019) (*Narrow Woven Ribbons from China* POR 2015 first opinion); *Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) (*Aluminum Foil CVD Investigation* first opinion); *Jiangsu Zhongji Lamination Materials Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 41, SLIP OP. 2020-39 at 5 (Mar. 24, 2020) (*Aluminum Foil CVD Investigation* remand

opinion).

The *Guizhou Tyre* litigation arose from the *OTR Tires from China* 2014 administrative review. The Department's second remand redetermination filed with the Court in that case is substantially the same reasoning used in the Final IDM in the instant case, which was scrutinized and criticized by the Court. *See Guizhou Tyre*, 415 F. Supp. 3d 1402 (Ct. Int'l Trade 2019). In pertinent part, the Court held:

> The Department has provided a myriad of reasons why verification might be onerous without additional information pertaining to the EBCP revisions. But until these reasons are grounded in facts supported by the record—that is, until the Department actually attempts verification and adequately confronts these (purportedly) insurmountable challenges, there is little for the Department to hang its hat on when it "continues to find a 'gap' in the record." The court is sympathetic to the Department's struggles surrounding this Program, but an adverse inference is not one that can be applied just because the Department is unsatisfied with the respondent's answers about the EBCP's operations—a program that Plaintiffs do not even use, according to the only evidence available on the record. The court remains convinced that the Department has not adequately addressed what the gap in the record is (as required under the AFA statute), or, that the missing information is required to effectively verify respondent's non-use of the Program.

*Id.* at 1405.

Indeed, the record in the instant investigation contains no

evidence that Yinfeng or its customers used or benefitted from the EBC

program.  Instead of confronting the record evidence and conducting a

verification of non-use as the Department normally does for all other

programs that Respondents asserted not to have used, for EBCP, the

Department completely disregarded the record evidence and applied

AFA based on a vague claim that, due to GOC's failure to submit the

2013 Revisions and a list of partner banks, the Department lacked a

complete and reliable understanding of the program.

Furthermore, Yinfeng cooperated in this investigation to the

utmost of its abilities.  Regarding the impact of AFA on fully

cooperating parties when applied to a non-cooperating party, the

Federal Circuit found in *Fine Furniture* that in a countervailing duty

investigation, a collateral impact on a cooperating party does not render

the AFA application against the foreign government improper.  *Fine*

*Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372 (Fed.

Cir. 2014).  Central to the Federal Circuit's decision, however, was the

fact that the adverse inferences were used to substitute for information

the GOC failed to provide and were <u>not</u> used against Fine Furniture.

The  Government  points  out  that  **the  Department  used**

> **respondents' actual reported data to measure the benefit received in order to ensure that the adverse inference was applied only with regard to the missing information and not the information supplied by Fine Furniture.** Therefore, the Government argues, by not substituting any adverse inferences for the facts provided by Fine Furniture, the Department did not apply adverse inferences against Fine Furniture.

*Fine Furniture*, 748 F.3d 1365, 1371 {emphasis added}.  The Federal Circuit therefore found that "the Department did not apply adverse inferences to substitute for any information that was actually submitted by the cooperating respondents, such as the actual rate Fine Furniture reported paying for electricity."  *Id.* at 1372.  However, in the instant case, the Department did precisely the opposite – it applied adverse inferences against the GOC and substituted facts available for the record evidence supporting a finding of non-use of the EBC program that was provided by the cooperating respondent and its customers.

In *Changzhou Trina II,* for instance, the Court acknowledged that if a foreign government fails to cooperate in a countervailing duty case, the Department may apply AFA even if the collateral effect is to adversely impact a cooperating party." *See Changzhou Trina II*, 352 F. Supp. 3d 1316, 1325.  But, in the very next sentence, the Court states

that "the Department, however, should seek to avoid such impact if
relevant information exists elsewhere on the record." *Changzhou Trina*
*II*, 352 F. Supp. 3d at 1325.  *Changzhou Trina II* is the Court's first
opinion remanding several aspects of the Department's final results in
the *Solar Cells from China* POR 2014 CVD review.  *See id.* at 1323.  In
that opinion, the Court overturned the Department's AFA finding on
the EBC program and directed the Department to explain what
information is actually missing from the record, and reasonably show
that such information is, in fact, unverifiable.  *Id.*, at 1327.

However, following the Court's opinion in *Changzhou II,* upon
remand, the Department used the same exact reasoning as it used in
Yinfeng's case and insisted that it could not verify non-use of the EBC
program because it does not have a list of partner banks involved in the
disbursement of the EBC loan, which was remanded by the Court in
*Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl.
Trade LEXIS 138; SLIP OP. 2019-137, dated November 2019 - three
months before the Department released the Final IDM in the instant
case ("*Changzhou Trina IV*").  The Court stated, yet again, that "it
cannot sustain the Department's determination that verification would

16

be impossible or unduly onerous," and "it is still not entirely clear to the court that the missing information is required to effectively verify respondent's non-use of the program." *Changzhou Trina*, SLIP OP. 2019-137 at 11. Little room remains for the Department to distinguish the instant case from *Changzhou Trina II* and its subsequent remand opinion.

In the *Aluminum Foil from China CVD Investigation* litigation, the Court of International Trade held:

> the Department again does not explain why a complete understanding of the operation of the program is necessary to verify non-use of the program. … In its brief to the court, for example, the government provides one such explanation: that the identities of third-party banks allegedly involved are unknown to the Department, and those names, not "China Ex-Im Bank," would appear in the records of U.S. customers that received EBCP credits. Thus, if the Department were to verify the ledgers of U.S. customers, it could check for credits from those third-party banks…. But that argument still fails to explain how the 2013 rule change "affected the way {the Department} conducts verification" of non-use claims. Critically, the Department does not explain why it could not identify the intermediate banks and the corresponding bank disbursement information by soliciting information from respondents. Instead, the Department summarily declares that, as the "primary entity" involved, the Ex-Im Bank is the only entity that possesses records sufficient to verify claims of non-use.

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F.

Supp. 3d 1317, 1333-34 (Ct. Int'l Trade 2019) ("*Jiangsu Zhongji I*")
(internal citation omitted).  The Court instructed the Department to
"consider what information could be verified that would show non-use"
and emphasized that "effort should be made to avoid the collateral
consequences to cooperating parties of another's non-cooperation."  *Id.*,
at 1334 (*citing Archer Daniels Midland Co. v. United States*, 917, F.
Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013)).  On remand, the
Department opted to remove the EBC rate from Jiangsu Zhongji' rate
but did so only "under respectful protest." *Jiangsu Zhongji Lamination
Materials Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 41, SLIP
OP. 2020-39 at 5 (Mar. 24, 2020) ("*Jiangsu Zhongji II*").  The
Department still insisted that it does not know how to verify non-use of
the program and refused to even issue the proposed questions to
Zhongji's customers. *See id.* at 6 - 7.  Indeed, as the Court in *Jiangsu
Zhongji II* observed, "the Department's true position is that it wishes to
rely solely on GOC's failures" and after the position being rejected by
the Court in many cases, it now has "interposed non-verifiability or
incompleteness as reasons to maintain the EBCP as contributing to the
CVD rates, without much to back up such stances." *Id.* at 7-8.

In sum, the Department's finding that Yinfeng used and benefitted from the EBC program is unsupported by record evidence. The administrative record provides the Department with no basis upon which to find that Yinfeng used or benefitted from the EBC program. As the Department itself chose not to attempt verification of Yinfeng's customers' assertion of non-use, their statements of non-use must be deemed accurate.  The Department for years seems content to rely upon its unsupported assertions that it is not possible to verify a customer's loans or the reasons for the loans.  Nothing has changed in the Department's stance in Final Determination on review despite a cascade of criticism from all corners of the U.S. Court of International Trade.

## B. The Department Unlawfully Expanded the Primer for LTAR Program.

Based upon the petitioner's New Subsidy Allegations, the Department initiated on additional programs including "the provision of primer, including gesso, (primer) for less than adequate remuneration ("LTAR").  Despite the program being specific to primer, the Department unlawfully expanded the program to include the raw

materials used by the respondent to produce primer, namely acrylic

polymer.  The Department may only calculate a benefit for a program

that has been alleged with information meeting the requirements to

find a countervailable benefit for that program, i.e., that GOC through

domestic producer "authorities" conferred a financial benefit in the form

of the provision of the good for LTAR to a limited number of

industries/enterprises meeting the specificity requirements under the

law.  *See, generally*, Mouldings Post Prelim. Analysis Memo (discussing

its finding of a countervailable benefit for the LTAR programs alleged).

To the extent that the Department made this finding for primer,

including gesso (a type of primer), the Department did <u>not</u> make this

finding with respect to acrylic polymer.  The Department never initiated

on a program including acrylic polymer; therefore, the Department

lacks the authority to determine that a Chinese Government

"authority" conferred a benefit for purchases of acrylic polymer.

On May 6, 2020, petitioner filed a new subsidy allegation

including on the provision of "primer, including gesso."  *See* Pet. NSA

(May 6, 2020).  Petitioner explained that "[b]oth gesso and other

primers are often applied to wood mouldings and millwork products,

20

and they may be used by the mandatory respondent in this investigation to coat and finish its subject merchandise." Petitioner presented information that supposedly Chinese producers of subject merchandise benefit from the receipt of "primer, including gesso" for LTAR. *Id.* at 8-10. Petitioner alleged that the "provision of primer, including gesso, for LTAR constitutes a financial contribution" pursuant to 19 U.S.C. § 1677(5)(D)(iii). *Id.* at 9. Petitioner alleged that under 19 U.S.C. § 1677(5A)(D) of the Act, the provision of "primer, including gesso", by the Chinese government is specific, in law and/or in fact, because the benefits are provided to a limited group of preferred enterprises and industries, i.e. the Chinese wood products industry, including wood moulding and millwork products industry. *Id.* at 9. Petitioner provided data under HTS 3209.10 and 3209.90 to demonstrate that Chinese producers of wood moulding and millwork were likely receiving "discounted gesso and other primers." *Id.* at 10-11 & Exhibit 15. As discussed further below, HTS 3209.10 and 3209.90 do not cover acrylic polymer; these HTS cover paint. Petitioner's NSA submission only concerned "gesso and primer" as repeated throughout the NSA submission at every evidentiary burden petitioner had to meet

21

to raise the program as worthy of investigation mid-stream in the
administrative proceeding.

Accordingly, the Department initiated a program on the
"Provision of Primer, Including Gesso (Primer), for LTAR." Dep't NSA
Questionnaire to GOC (June 11, 2020). The Department issued a
questionnaire to the GOC, requesting information on the "The Primer
Industry" and "Producer of Primer." *Id.* at 7-10. Likewise, the
Department issued a questionnaire to the respondent, requesting
information on its purchases and suppliers of "Primer, Including Gesso
(Primer)." Dep't NSA Questionnaire to Yinfeng (June 11, 2020).

Yinfeng timely filed its NSA questionnaire response. Yinfeng
exported subject merchandise produced by its affiliate, Mangrove, and
therefore answered questions from Mangrove regarding production.
Understanding that "primer" includes paint used in producing and
finishing merchandise, as alleged by petitioner, Mangrove reported its
purchases of paint. *See* Yinfeng NSA (June 25, 2020) at 2 & Exhibit
SQ4-1. Mangrove further explained that it had no purchases of gesso
because it produced it itself "with the upstream materials, i.e. acrylic
polymer and calcium carbonate, as well as other materials used in the

normal business of operation." *Id.* at 2.  GOC timely filed its NSA

questionnaire response.  *See* GOC NSA (July 6, 2020).  GOC answered

the Department's questions on the <u>primer</u> industry and <u>primer</u>

producers, as requested by the questionnaire.  GOC provided the input

producer index and information on Mangrove's suppliers of primer.  *Id.*

The Department issued Yinfeng a supplemental questionnaire

specifically requesting that Mangrove report its purchases of acrylic

polymer.  Yinfeng Supplemental NSA Questionnaire (August 17, 2020)

at 1-2.  Yinfeng/Mangrove complied with the Department's request, but

explained that acrylic polymer cannot be considered a paint or primer

(including gesso).  *Id.* at 1-2 & Exhibit SQ5-1.  Indeed, acrylic polymers

<u>cannot</u> be used as a paint or primer (including gesso).  Mangrove

produced gesso, and acrylic polymer was one of the upstream raw

materials used to produce the gesso.  Yinfeng maintained that this is an

obviously different product not alleged by petitioner to be sold at LTAR.

*Id.* at 2.  The record supports this fact.

Whether acrylic polymers are the same as a primer became the

focus of the Department's investigation on this program.  Indeed, in the

Final Determination, the Department's sole justification for including

the acrylic polymers in this program was its determination that "acrylic polymer, as a stand-alone product, could be considered to be or used as a primer."  Final IDM at **Appx001049**.  However, this finding is not supported by substantial evidence.  "[S]ubstantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'"  *Diversified Products Corp. v. United States*, 6 C.I.T. 155, 161, 572 F. Supp. 883, 888 (1983) (quoting *Universal Camera*, 340 U.S. at 488); *see also Shandong Rongxin Imp. & Exp. Co. v. United States,* 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016) (Moreover, "Commerce's determination cannot be based on isolated tidbits of data which suggest a result contrary to the clear weight of the evidence.") (internal citation omitted).

In the NSA questionnaire and a supplemental request for new factual information, Yinfeng provided substantial information demonstrating that acrylic polymer is <u>not</u> primer and cannot be used as primer.  As an initial matter, Yinfeng itself has certified to the fact that the company cannot and does not use the acrylic polymer it purchased as a primer or paint.  *See* Yinfeng NSA Qre (June 25, 2020) at **Appx012207**; Yinfeng NSA Rebuttal Comments (July 10, 2020) at **Appx012536-012537**; Yinfeng Supplemental NSA Qre (August 17, 2020) at **Appx012561**.  Mangrove's acrylic polymer supplier even provided a certification that it sold Mangrove a water-based acrylic polymer that is in primary forms under HTS390690, which "cannot be used a primer without further processing.  It is one of the materials used to produce gesso."  Yinfeng Primer NFI Submission (September 25, 2020) at **Appx013092-013094**.

Yinfeng also provided third party general information on gesso, primer/paint, and acrylic polymer.  *Id.* at **Appx012944-013091**. Gesso is a type of primer, also called a ground.  *Id.* at **Appx012947-012948**. Acrylic gesso is a type of gesso made from acrylic polymer emulsion and other materials, namely titanium dioxide, calcium carbonate, and other

25

chemicals.  *Id.* at **Appx012947-012973**.  The acrylic polymer is a

medium that serves as a binder.  The titanium dioxide is a pigment,

making the acrylic gesso very white and opaque.  The calcium carbonate

(chalk) is added to make the gesso have a matte finish, an absorbent

surface, and enough tooth (or roughness) to pull the paint off the brush.

Other chemicals are also added to keep the surface flexible and avoid

fading.  *Id.*  The record establishes that acrylic polymer on its own is a

chemical binder and must be further processed to be used as a primer or

gesso.  *Id.* at **Appx012975-012993** (information on acrylic polymer).

Even the articles provided by petitioner describe acrylic polymers <u>for</u>

coatings or <u>for</u> paints and primers.  Petitioner NFI Submission

(September 24, 2020) at **Appx013118-013128**.  The language indicates

that acrylic polymer is used in coatings and paints—<u>not as a paint or

coating by itself</u>.  Petitioner's submitted definition of acrylic polymer

likewise says it is "utilized in base coats as binders, which bind the

pigments together."  *Id.* at **Appx013137-013150**.  Other articles

submitted by petitioner discuss acrylic paint primer, which is also not

the same as using straight acrylic polymer.  *Id.* at **Appx013129-013136**.

Moreover, as explained above, in Mangrove's production of subject

merchandise, it does not use acrylic polymer as a primer but uses it as a raw material to produce gesso.

Further, acrylic polymer is classified under a different HTS. Yinfeng Primer NFI at **Appx012995-013091**.  Paints are classified under HTS chapter 32 and plasters (such as gesso) are classified under HTS chapter 25.  But acrylic polymer is classified under chapter 39.  This is evident from the HTS chapters provided.  The record also contains US Customs rulings demonstrating that acrylic polymer is classified under Chapter 39 while acrylic polymer paints/primers are under Chapter 32. *Id.* at **Appx013081-013091**.  Accordingly, acrylic polymer is substantially transformed when made into a paint or primer.  This information confirms what Yinfeng/Mangrove has certified from its own manufacturing experience and the industry generally, that acrylic polymer is an entirely different product from primer/gesso and must be further processed to be used as a primer. Indeed, Mangrove does substantially transform the acrylic polymer into gesso, which is then used on subject merchandise.  Therefore, acrylic primer cannot be included in a program on primer/gesso.  Petitioner alleged and the

27

Department initiated the program on primer/gess; it cannot be expanded lawfully to any upstream material used to produce gesso.

The expansion of this program is unlawful but also is contrary to Department practice. The Department only investigates and confers a benefit for a program that was alleged. 19 U.S.C. 1671a (discussing the requirements for initiating a countervailing investigation); *see also* 19 C.F.R. 351.301(2)(iv) (setting deadline for when petitioner can raise new subsidy allegations); *see also* 19 C.F.R. 351.311 (discussing the circumstances when the Department can investigation a subsidy alleged during the investigation rather than at the outset). As explained above, no program on acrylic polymer was alleged.

Further, Article 11.2 of the WTO Agreement on Subsidies and Countervailing Measures dictates that investigations may not be initiated based on "simple assertion, unsubstantiated by relevant evidence." Sufficient evidence with regard to the existence, amount, and nature of a subsidy must be presented for the Department to initiate the investigation of another program, consistent with Article 11.2(iii). Yinfeng understands, therefore, that at a minimum, a proper new subsidy investigation allegation or initiation on a program specific

28

to acrylic polymer must be made before acrylic polymer can be
investigated and before the Department can rule that such program
confers a countervailable benefit for purchases of acrylic polymer.  No
such program was initiated.  As such  the Department's Final
Determination is unlawful with respect to acrylic polymer.

Moreover, in the investigation of *Fine Denier Polyester Staple
Fiber from China*, the Department specifically dealt with a similar
situation and did not investigate the upstream raw materials.  In
that case, as in the instant investigation, the respondent self-
manufactured the input alleged at LTAR rather than directly
purchasing it.  The Department did <u>not</u> calculate a subsidy rate for
those upstream raw materials and did not investigate the upstream
raw materials used to produce the product in question.  *See Fine
Denier Polyester Staple Fiber From the People's Republic of China:
Preliminary Affirmative Countervailing Duty Determination*, 82 Fed.
Reg. 51,396 (November 6, 2017) and accompanying IDM at Cmt 4
("The Hailun companies reported only self-produced or foreign
purchases of PTA during the POI, and we did not calculate a subsidy
rate for these purchases.").  This supports the legal premise above,

29

i.e., that the Department does <u>not</u> expand its investigation to include the upstream raw materials used to produce the investigated raw material at LTAR.  The Department did not disagree with this precedent, but rather continued to maintain without substantial record support that the facts here were different because acrylic polymer supposedly could be used as primer or gesso in its own right. Final IDM at **Appx001049**.  The Court should order Commerce to follow the law, previous practice, and the clear language of the program alleged and not countervail the upstream raw materials that Yinfeng used to produce primer or gesso.

### C.   The Department's Ocean Freight Benchmark is Not Supported by Substantial Evidence.

In calculating the benchmark price for the provision of an input at less than adequate remuneration ("LTAR"), the Department adds an ocean freight cost to approximate the cost of shipping that input from around the world to China.  For the provision of sawnwood and plywood for LTAR programs, the record contains three datasets of such costs for this purpose.  Yinfeng submitted ocean freight data from Maersk with prices for shipping plywood and shipping lumber during each month of the POI.  *See* Yinfeng Benchmark Submission (May 11, 2020) at

**Appx014943-015054**.  Yinfeng also submitted Descartes ocean freight prices for shipping plywood during each month of the POI.  *Id.* at **Appx015055-015070**.  Petitioner also submitted Descartes ocean freight prices for shipping plywood.  Petitioner Benchmark Submission (May 11, 2020) at **Appx015345-015357**.  In the Final Determination, the Department relied upon all three datasets.  However, the Descartes data submitted by petitioner fails to fulfill the statutory and regulatory requirements for benchmark data and its use is not supported by substantial evidence.  **Appx001063-001064**.

When the Department uses tier-two benchmarks, as it did for these programs, it considers whether it is getting a world benchmark that would be comparable to what purchasers in China would obtain:

> In selecting a world market price, Commerce will "seek" to measure the adequacy of remuneration by comparing the government price to a "world market" price where it is reasonable to conclude that such a price would be available to purchasers in the country in question. 19 C.F.R. §351.511(a)(2)(ii). Where there is more than one commercially available "world market price," Commerce will average such prices, to the extent practicable, "making due allowance for factors affecting comparability." *Id.*  Such factors include delivery charges and import duties, and these Commerce will include, if not otherwise included, when adjusting "the comparison price to reflect the price that a firm actually paid or would pay if it imported the product". *See* 19 C.F.R. §351.511(a)(2)(iv).

31

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1332 (Ct. Int'l Trade 2015); *see also Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1374 (Ct. Int'l Trade 2015) ("The statute requires that 'the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.' 19 U.S.C. § 1677(5)(E). Such '[p]revailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.' Id.").  The Descartes data submitted by petitioner fails to reflect the price that a firm would pay for ocean freight if importing plywood and thus does not reflect prevailing market conditions for the import of the inputs allegedly purchased at LTAR.

Petitioner submitted Descartes data for only one route from Norfolk, VA to Tianjin, China.  The rate is based on a 40 foot, 9'6" high cube container.  A high cube container is special type of container and costs more to ship.  Petitioner has not provided any information that high cube containers are typical for plywood or sawnwood.  High cube containers are typically used for bulky or voluminous but light cargos.

32

The reason is that the high container can be filled without exceeding the max payload for the container. This is not typical, however, for plywood shipments, which are dense, compact, and heavy. *See* Yinfeng Rebuttal Benchmarks at **Appx015784-015790** (information on high cube containers). Further, Petitioner's plywood Descartes ocean freight rates have numerous atypical charges. The base rate is only 1200 USD, but there are additional charges including a 1551 USD for weight cargo surcharge and an 800 USD port congestion surcharge. These are atypical charges for overweight cargo and congested ports. *See* Yinfeng Rebuttal Benchmarks at **Appx015726-015780** (information on Descartes shipping terms).

There is no record evidence to suggest that Yinfeng or any normal commercial purchaser would undergo such unusual charges at all, much less on a regular basis for all shipments. Accordingly, such costs must not be included in the benchmarks. In contrast, the Descartes and Maersk data provided by Yinfeng have no indications of any unusual charges. The rates provided by Yinfeng are based on normal shipping conditions, indicative of prevailing market conditions. Yinfeng submits given this rate is for an atypical container size and a less commercial

route, detailed below, it is only reasonable to exclude it from the benchmark all together.  However, if the Court finds the rate can still be relied upon, the Court should order the Department to remove the atypical very high surcharges and rely solely on the 1200 base rate.

Lastly, Norfolk to Tianjin is not a major shipping route.  Yinfeng supplied information on the busiest container ports in the world.  *See* Yinfeng Benchmarks at **Appx015071-015077**.  Norfolk is not a major world port.  In contrast, Yinfeng supplied ocean freight rates from the two busiest U.S. ports Los Angeles/Longbeach and Newark/New York to Shanghai, the busiest port in China and the world.  The routes provided by Yinfeng are major commercial routes that are representative of prevailing market conditions.  *See* 19 U.S.C. § 1677(5)(E).  The Court should remand to the Department to rely solely on ocean freight data that fulfils the statutory obligations, i.e., the ocean freight data provided by Yinfeng.

### D.   The Department Should Rely Upon the Contemporaneous Land Benchmark.

The Department placed benchmark information on the record to value land from "Asia Marketview Reports" by CBRE Research for Thailand for the year 2010.  Prelim. IDM at **Appx001432**;

34

**Appx022782-022791**.  The Department relied upon this data in the
Preliminary and Final Determinations.  IDM at **Appx001055-001058**.
The Department has relied upon this source for valuing land in
several investigations and reviews.  *Id.*  However, the record contains
contemporaneous world land values from the same CBRE Research
source on the record as well as from the Malaysian Investment
Development Authority ("MIDA").  *See* Yinfeng Benchmark
Submissions (May 11, 2020) at **Appx015143-015184** ("CBRE Global
Prime Rents") & **Appx015085-015142** (MIDA Cost of Industrial
Land).  Both of these sources better fulfill the Department's
preferences for benchmarks and should have been relied upon.  In
short, it is time for the Department to move on from the stale 2010
land benchmark data.

First, the benchmark used by the Department is based solely on
land prices in 2010.  The Department used an inflation index to
extrapolate the price from a single year to apply to the POR, 2017, and
other years with land purchases.  However, the CBRE Global Prime
Rents placed on the record contains land values for 2015-2018 and the
MIDA source provides land values from 2014-2019.  These values are

contemporaneous with the POR and provide prices from a larger, more representative period of time.  Moreover, as evidenced by the CBRE Global Prime Rents data and the MIDA data, the value of land does not merely follow the inflation index.  Therefore, the contemporaneity and additional years represented by these sources make each critically more representative than the 2010 data favored by the Department.

Second, the Department used prices from Thailand only, which is no longer considered economically comparable to China.  *Wood Mouldings and Millwork Products From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 85 Fed. Reg. 48669 (August 12, 2020) and *accompanying* IDM at 5 (listing Brazil, Bulgaria, Malaysia, Mexico, Russia, and Turkey as economically comparable to China based on 2018 GNI); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 7531 (February 10, 2020) and accompanying IDM at 15 (specifically

discussing that even based on 2017 GNI, Thailand is not economically comparable to China.  Thailand's GNI is too low and has remained too low to be comparable to China.).  In contrast, the contemporaneous MIDA source provides contains data from Malaysia, one of the countries the Department considers at the same level of economic development as China.  Likewise, the contemporaneous CBRE data contained world benchmark prices for land from multiple countries around the world including Mexico and Brazil, both counties that are also at the same level of economic development as China.

In response to this information, the Department claims it lacked information to determine whether Malaysia, Mexico, and Brazil are comparable, saying that the finding in an AD proceeding is different than that used for a benchmark in a CVD proceeding.  IDM. at **Appx001058**.  This reasoning must fail.  The Department has a long standing practice in the AD proceeding of determining economic comparability based upon per capita GNI.  Every single year the Department re-evaluates the per capita GNI of China and determines which countries are economically comparable.  This becomes the basis of determining the surrogate country, and the Department determines

normal value based on data from that country.  In other words, the

Department considers surrogate values from non-economically

comparable countries to be unreliable or otherwise non-comparable as a

benchmark.  Whether calling these values "surrogates" or

"benchmarks", their function is similar: an approximation of fair market

values or prevailing market conditions.

The Department has not provided any justification why its

reasoned finding in the companion AD reviews that Malaysia, Mexico,

Brazil are economically comparable has no bearing on economic

comparability in this CVD review.  It is the same agency determining

the same factor for the same ultimate goal, a market economy price.

*Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir.

2003) (The Department acts arbitrarily and capriciously when it

"consistently follow[s] a contrary practice in similar circumstances and

provide[s] no reasonable explanation for the change in practice.")  *SKF*

*USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (It is

well-established that "[a]n agency action is arbitrary when the agency

offers insufficient reasons for treating similar situations differently.")

(alteration, quotation marks and citation omitted).

38

Indeed, when the Department first determined that Thailand was economically comparable in the CVD proceeding for benchmark purposes, at that time the Department also considered Thailand to be economically comparable in the AD proceeding and included it among the potential surrogate countries.  For several years now, the Department has *not* considered Thailand to be economically comparable in AD proceedings, but has considered Malaysia, Mexico, Brazil to be comparable to China because Thailand had slipped in relation to China's per capital GNI  vis-à-vis these three countries.

The Court should order the Department to reconsider its decision to rely upon the outdated 2010 Thai CBRE data for the reasons discussed above: it is outdated, based on more limited data, and originates from a non-economically comparable country

IV.   Conclusion and Prayer for Relief

In light of the foregoing, aspects of the Department's *Final Determination* was not supported by substantial evidence or in accordance with the law; and, in the case of the land benchmark, aspects of its decision were arbitrary and capricious.  Plaintiff respectfully requests that the Court remand this case for redetermination of the issues according to their presentation in this brief.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
DEKIEFFER & HORGAN, PLLC
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com

Date: August 17, 2021              *Counsel to Plaintiff*

*Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (14 point Century font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains <u>7,722</u> words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz
_____
Gregory S. Menegaz
DEKIEFFER & HORGAN, PLLC
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

1