# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

| | |
|---|---|
| FUJIAN YINFENG IMP & EXP TRADING CO., LTD., ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Court No. 21-0088 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| *Defendant,* ) | |
| ) | |
| and ) | |
| ) | |
| COALITION OF AMERICAN MILLWORK PRODUCERS, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |
| _____) | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Of Counsel:

LESLIE LEWIS
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW

BRIAN M. BOYNTON
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

IOANA CRISTEI
Trial Attorney
Commercial Litigation Branch

Washington, DC 20005               U.S. Department of Justice
                                   Civil Division
                                   P.O. Box 480
                                   Ben Franklin Station
                                   Washington, D.C. 20044
                                   Tel: (202) 305-0001

December 9, 2021                   *Attorneys for Defendant*

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ............................................ 2

   I.    Administrative Determination Under Review ............................ 2

   II.   Issues Presented For Review ...................................................... 3

STATEMENT OF FACTS ................................................................... 3

   I.    Initiation Of Investigation .......................................................... 3

   II.   The Export Buyer's Credit Program .......................................... 7

   III.  Benchmark Data To Measure Less Than Adequate
        Remuneration ............................................................................ 10

   IV.  Preliminary Determination And Post-Preliminary Decision
        Memorandum ............................................................................ 11

   V.    Final Determination .................................................................. 14

SUMMARY OF THE ARGUMENT ...................................................... 15

ARGUMENT ..................................................................................... 18

   I.    Standard Of Review .................................................................. 18

   II.   Commerce Lawfully Made An Adverse Inference In Determining
        That Yinfeng Used The Export Buyer's Credit Program .......... 20

      A.   Legal Framework ................................................................ 21

      B.   Commerce Lawfully Applied Facts Available With An Adverse
          Inference To The EBC Program As A Result Of The
          Government Of China's Failure To Cooperate ...................... 25

   III.  Commerce's Inclusion Of Acrylic Polymer In The Provision Of
        Primer, Including Gesso, Program Is Supported By Substantial
        Evidence And Otherwise Lawful .............................................. 40

      A.   Legal Framework ................................................................ 40

      B.   Commerce Correctly Included Acrylic Polymer In The
          Provision Of Primer Program .............................................. 43

IV.   Commerce's Selection Of Benchmark Data For Ocean Freight
      And Land-Use Is Supported By Substantial Evidence And
      Otherwise Lawful ........................................................................54

  A.   Commerce's Ocean Freight Benchmark Is Supported By
       Substantial Evidence And Otherwise Lawful ........................54

  B.   Commerce's Reliance On Land Benchmark Data Is Supported
       By Substantial Evidence And Otherwise Lawful ...................62

CONCLUSION ........................................................................................71

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
287 F. Supp. 3d 1361 (Ct. Int'l Trade 2018) ..................................... 24

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ......................................................... 19

*Changzhou Trina Solar Energy Co. v. United States*,
466 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ..................................... 38

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ..................................... 23

*Changzhou Trina Solar Energy Co. v. United States*,
195 F. Supp. 3d 1334, 1355 (Ct. Int'l Trade 2016) .................... 36, 37

*Clearon Corp. v. United States*,
474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020) ..................................... 38

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) ......................................................... 19

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ........................................................................... 19

*Corus Staal BV v. United States*,
395 F.3d 1343 (Fed. Cir. 2008) ......................................................... 53

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) ......................................................... 41

*Essar Steel Ltd. v. United States*,
721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ..................................... 24

*Fujitsu Gen. Ltd. v. United States*,
88 F. 3d 1034 (Fed. Cir. 1996) .................................................... 18, 19

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ..................................... 20

i

*Goodluck India Ltd. v. United States,*
    11 F.3d 1335 (Fed. Cir. 2021) ........................ 29, 31, 32, 33, 34, 35, 36

*Guizhou Tyre Co., Ltd. v. United States,*
    348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ..................................... 38

*Guizhou Tyre Co., Ltd. v. United States,*
    399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) ..................................... 38

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States,*
    405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ..................................... 23

*KYD, Inc. v. United States,*
    607 F.3d 760 (Fed. Cir. 2010) ......................................................... 22

*Ltd. v. United States,*
    748 F.3d 1365 (Fed. Cir. 2014) ........................... 22, 24, 25, 27, 28, 29

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States,*
    753 F.3d 1227 (Fed. Cir. 2014) ....................................................... 24

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003) .............................................. 22-23, 23

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ....................................................... 19

*PAM, S.p.A. v. United States,*
    582 F.3d 1336 (Fed. Cir. 2009) ....................................................... 18

*Papierfabrik August Koehler SE v. United States,*
    843 F.3d 1373 (Fed. Cir. 2016) ....................................................... 23

*RZBC Grp. Shareholding Co. v. United States,*
    222 F. Supp. 3d 1196 (Ct. Int'l Trade 2017) ..................................... 37

*Ticaret A.S. v. United States,*
    61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ..................................... 29

*Timken Co. v. United States,*
    699 F. Supp. 300 (Ct. Int'l Trade 1988) ..................................... 20, 21

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009) ....................................................................... 18

## Statutes

19 U.S.C. § 1516a ................................................................. 18

19 U.S.C. § 1671a .......................................................... 43, 44, 50

19 U.S.C. § 1677 ............................... 40, 43, 45, 48, 49, 58, 59, 60

19 U.S.C. § 1677e ........................................................ 21, 22, 39

19 U.S.C. § 3512 ...................................................................... 53

19 U.S.C. §§ 1677e ...................................................... 37, 43

## Administrative Determinations

*Antidumping Methodologies in Proceedings Involving Non-Market
Economy Countries: Surrogate Country Selection and Separate Rates*,
   72 Fed. Reg. 13,246 (Dep't of Commerce Mar. 21, 2007) ...... 68, 69, 70

*Certain Steel Racks from China: Preliminary Affirmative
Countervailing Duty Determination*,
   83 Fed. Reg. 62,297 (Dep't of Commerce December 3, 2018) ........... 65

*Countervailing Duties*,
   63 Fed. Reg. 65,348, 65,377 (Dep't of Commerce Nov. 25, 1988)...... 42

*Countervailing Duty Investigation of Certain Iron Mechanical Transfer
Drive Components from the China: Final Affirmative Determination*,
   81 Fed. Reg. 75,037 (Dep't of Commerce October 28, 2016) ........... 64

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into
Modules, from the People's Republic of China: Final Affirmative
Countervailing Duty Determination*,
   77 Fed. Reg. 63,788 (Dep't of Commerce October 17, 2012) ............ 64

*Dynamic Random Access Memory Semiconductors from the Republic of Korea*,
    72 Fed. Reg. 7,015 (Dep't of Commerce Feb. 14, 2007)......... 43, 44, 45

*Fine Denier Polyester Staple Fiber from China: Preliminary Affirmative Countervailing Duty Determination*,
    82 Fed. Reg. 51,396 (Dep't of Commerce November 6, 2017) .......... 52

*Laminated Woven Sacks from China: Preliminary Affirmative Countervailing Duty Determination*,
    72 Fed. Reg. 67,893 (Dep't of Commerce December 3, 2007) .......... 70

*Multilayered Wood Flooring from China:  Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2017*,
    85 Fed. Reg. 6,908 (February 6, 2020) ............................................. 50

*Multilayered Wood Flooring from China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*,
    85 Fed. Reg. 76,011 (November 27, 2020)........................................ 51

*Solar Cells Final Determination; Certain Hardwood Plywood Products from China: Final Affirmative Determination*,
    82 Fed. Reg. 53,473 (Dep't of Commerce November 16, 2017) ........ 64

*Wood Mouldings and Millwork Products from China:  Initiation of Countervailing Duty Investigation*,
    85 Fed. Reg. 6,513, 6,516 (February 5, 2020) ..................................... 4

*Wood Mouldings and Millworks Products from China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*,
    85 Fed. Reg. 35,900 (June 12, 2020)................................ 11, 12, 13, 14

*Wood Mouldings and Millwork Products from the People's Republic of China: Countervailing Duty Order*,
    86 Fed. Reg. 9,484 (Dep't of Commerce February 16, 2021) .......... 2-3

*Wood Mouldings and Millwork Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
   86 Fed. Reg. 67 (Dep't of Commerce Jan. 4, 2021)................................ 2

## Regulations

19 C.F.R. § 351.307 ..................................................................... 29

19 C.F.R. § 351.308 ..................................................................... 22

19 C.F.R. § 351.511 ...................................... 41, 42, 43, 54, 55, 57, 60, 62

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| CBRE | CB Richard Ellis |
| China | People's Republic of China |
| Commerce | Department of Commerce |
| GNI | Gross national income |
| HTSUS | Harmonized Tariff Schedule of the United States |
| IDM | Issues and Decision Memorandum |
| PDM | Preliminary Decision Memorandum |
| POI | Period of investigation |
| WTO | World Trade Organization |

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

———————————————————

| | | |
|---|---|---|
| FUJIAN YINFENG IMP & EXP TRADING CO., LTD., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Court No. 21-0088 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COALITION OF AMERICAN MILLWORK PRODUCERS, | ) | |
| | ) | |
| *Defendant-Intervenor.* | ) | |

———————————————————)

## DEFENDANT'S MEMORANDUM
## IN OPPOSITION TO PLAINTIFF'S RULE 56.2
## <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Defendant, the United States, respectfully submits this response

to the motion for judgment on the agency record filed by plaintiff,

Fujian Yinfeng Imp & Exp Trading Co., Ltd., (Yinfeng), challenging the

Department of Commerce's final determination in the countervailing

duty investigation of wood mouldings and millwork products from the

People's Republic of China (China).  As demonstrated below,

1

Commerce's affirmative determination is supported by substantial

evidence and is otherwise in accordance with law.  Accordingly, the

United States respectfully requests that the Court sustain Commerce's

determination, deny Yinfeng's motion and enter judgment in favor of

the United States.

## STATEMENT PURSUANT TO RULE 56.2

I.    Administrative Determination Under Review

Yinfeng challenges various aspects of Commerce's final

determination in the countervailing duty investigation of wood

mouldings and millwork products (millwork products) from China.  *See*

*Wood Mouldings and Millwork Products From the People's Republic of*

*China: Final Affirmative Countervailing Duty Determination*, 86 Fed.

Reg. 67 (Dep't of Commerce Jan. 4, 2021) (*Final Determination*) (P.R.

484), and accompanying Issues and Decision Memorandum (IDM) dated

December 28, 2020 (P.R. 477).  Following an affirmative injury

determination by the U.S. International Trade Commission, Commerce

published a countervailing duty order on February 16, 2021.  *See Wood*

*Mouldings and Millwork Products From the People's Republic of China:*

*Countervailing Duty Order*, 86 Fed. Reg. 9,484 (Dep't of Commerce

2

February 16, 2021) (P.R. 491).  The investigation covers entries of

millwork products from China for the period of January 1, 2019,

through December 31, 2019.

II.    Issues Presented For Review

1.    Whether Commerce's determination to countervail the

Export Buyer's Credit Program based on facts available with an adverse

inference is supported by substantial evidence and otherwise lawful.

2.    Whether Commerce's inclusion of acrylic polymer in the

provision of primer, including gesso, program is supported by

substantial evidence and otherwise lawful.

3.    Whether Commerce's ocean freight benchmark is supported

by substantial evidence and otherwise lawful.

4.    Whether Commerce's land-use benchmark is supported by

substantial evidence and otherwise lawful.

**STATEMENT OF FACTS**

I.    Initiation Of Investigation

On January 8, 2020, Commerce received a petition seeking the

imposition of countervailing duties on millwork products from China,

filed on behalf of the Coalition of American Millwork Producers

(petitioner).  *See* Antidumping and Countervailing Duty Petitions

3

(January 8, 2020) (P.R. 1-P.R. 15), (C.R. 1-C.R. 17).  On January 28, 2020, Commerce initiated this countervailing duty investigation on millwork products from China.  *See Wood Mouldings and Millwork Products from China:  Initiation of Countervailing Duty Investigation*, 85 Fed. Reg. 6,513, 6,516 (February 5, 2020) (*Initiation Notice*) (P.R. 59).

Commerce's investigation included the following subsidy programs:  (1) the Export Buyer's Credit Program from the Ex-Im Bank of China; (2) the provisions of primer including gesso, sawnwood, plywood; and land-use rights for less than adequate remuneration (LTAR).  *See* Countervailing Duty Initiation Checklist at 7-36 (*Initiation Checklist*) (P.R. 49), (C.R. 27).  Commerce also investigated petitioner's new subsidy and creditworthiness allegations.  *See* Decision Memorandum on New Subsidy Allegations and Creditworthiness Allegation at 2 (Dep't of Commerce June 4, 2020) (NSA Memorandum) (P.R. 272), (C.R. 147).

At initiation, Commerce stated that it would, if necessary, select respondents based on U.S. Customs and Border Protection (CBP) entry data during the period of investigation for specified Harmonized Tariff

Schedule of the United States (HTSUS) subheadings listed in the scope of the investigation. *Initiation Notice*, 85 Fed. Reg. at 6,516 (P.R. 59). Based on its analysis of the CBP data and the parties' comments, Commerce selected Yinfeng as a mandatory respondent. *See* Respondent Selection Memorandum at 5-6 (Dep't of Commerce February 21, 2020) (P.R. 95) (C.R. 36) (selecting mandatory respondents).[1]

Commerce issued its initial and supplemental questionnaires to the government of China and Yinfeng on February 21, 2020. *See* Government of China Initial Questionnaire (Dep't of Commerce February 21, 2020) (P.R. 96) (stating that the government of China is responsible for forwarding the initial questionnaire to respondent companies) (Gov't of China In. Quest.); Government of China Supplemental Questionnaire (Dep't of Commerce May 1, 2020) (P.R. 237), (C.R. 119) (Gov't of China  Supp. Quest.); Yinfeng and Mangrove Supplemental Questionnaire (Dep't of Commerce May 1, 2020) (P.R. 238), (C.R. 120) (Yinfeng Supp. Quest. Resp.).  Commerce also

---

[1]  While the investigation covers two mandatory respondents, Yinfeng and Fujian Nanping Yuanqiao Wood-Industry Co., Ltd. (Yuanqiao), Yuanqiao did not participate in this investigation and thus is not discussed in this brief.  IDM at 2.

requested that parties submit proposed benchmark data for Commerce

to measure the adequacy of remuneration for the various subsidy

programs.  *See* Benchmark Data Memorandum (Dep't of Commerce

May 4, 2020) (3971067-01).

Between March and May 2020, Commerce received timely initial

and supplemental questionnaire responses from the government of

China and Yinfeng, including Yinfeng's responses on behalf of its cross-

owned affiliate producer, Fujian Province Youxi City Mangrove Wood

Machining Co., Ltd. (Mangrove).  *See* Gov't of China's Initial

Questionnaire Response, dated April 13, 2020 (Gov't of China In. Quest.

Resp.) (P.R. 188-P.R. 218) (C.R. 70-C.R. 102); Gov't of China's

Supplemental Questionnaire Response, dated May 15, 2020 (P.R. 260),

(C.R. 123) (Gov't of China Supp. Quest. Resp.); Yinfeng's Letters,

"Identifying Affiliates Questionnaire Response," dated March 13, 2020

(P.R. 145), (C.R. 45) (stating that all subject merchandise exported to

the U.S. during the period of investigation (POI) by Yinfeng was

produced by its affiliate Mangrove); "Identifying Affiliates

Supplemental Questionnaire Response," dated April 10, 2020 (P.R. 182);

"Yinfeng Questionnaire Response," dated April 13, 2020 (P.R. 185),

(C.R. 49-55) (Yinfeng In. Quest. Resp.); "Yinfeng Third Supplemental

Questionnaire Response," dated May 18, 2020 (P.R. 262), (C.R. 143-44)

(Yinfeng Supp. Quest. Resp. 2); *see also* Yinfeng's Letter, "Mangrove

Questionnaire Response," dated April 13, 2020 (P.R. 187), (C.R. 57-69).

II.   The Export Buyer's Credit Program

In its initial questionnaire, Commerce requested that the

government of China provide the laws, regulations or other governing

documents for the Export Buyer's Credit Program, as well as a list of all

partner/correspondent banks involved in the disbursement of funds

under the Program.  *See* Gov't of China In. Quest. at II-6 and II-7; IDM

at 20.  Additionally, because in 2013 the government of China made

certain changes to the program, eliminating elements that Commerce

had previously used for verification, Commerce also requested the

revised 2013 administrative measures.  *See* Gov't of China In. Quest. at

II-6 and II-7; IDM at 19-20.  In response, the government of China

claimed that "none of the U.S. customers of the respondents used the

Export Buyer's Credit Program during the POI" and "{t}herefore, this

question is not applicable."  *See* Gov't of China In. Quest. Resp. at 60

(P.R. 188); *see also* IDM at 21 (P.R. 477).  Yinfeng responded to

7

Commerce's questionnaire by providing a list of U.S. customers during the period of investigation and declarations from its U.S. customers attesting to non-use of the Export Buyer's Credit Program. *See* Preliminary Decision Memorandum (PDM) at 15 (P.R. 274); *see also* Yinfeng In. Quest. Resp. at 24 (P.R. 185), (C.R. 49-55).

Commerce subsequently issued a supplemental questionnaire to the government of China, directly requesting, among other things:  (1) a list of all partner/correspondent banks involved in the disbursement of funds under the Export Buyer's Credit Program, and (2) a copy of the 2013 administrative measures relating to the Program. *See* Gov't of China Supp. Quest. at 3-4; *see also* IDM at 20-22.  To verify the government of China's assertion that it had confirmed non-use upon search of the China Ex-Im Bank database, Commerce requested the government of China provide "documents, databases, accounts, *etc.*" it examined, as well as a step-by-step detail of its query to determine there was non-use.  PDM at 15.

In its supplemental response, the government of China refused to provide additional documents or information regarding the 2013 revised administrative measures.  Instead, the government of China referred

Commerce back to its initial response, where it had also failed to respond to specific questions regarding the 2013 measures.  *See* Gov't of China Supp. Quest. Resp. at 5.  In fact, the government of China did not even acknowledge Commerce's direct request for the 2013 administrative measures.  *See* Gov't of China Supp. Quest. at 4; *id.* Gov't of China Supp. Quest. Resp.  In addition, the government of China failed to provide a list of all partner/correspondent banks involved in the disbursement of Export Buyer's Credit Program funds, concluding only that "neither the respondents nor their U.S. customers applied for, used, or benefited from {the} program during the POI: and "{t}herefore, the {government of China} understands that this question is not applicable."  *See* Gov't of China Supp. Quest. Resp. at 6; *see also* IDM at 23.  Further, the government of China "provided no supporting documentation demonstrating evidence of its data query from the {China Ex-Im Bank}," "did not explain how the {China Ex-Im Bank} performed the query search," and "provided no documentation demonstrating its 'checking' of listed importers with the {China Ex-Im Bank}."  PDM at 15.  Instead of providing sufficient responses to Commerce's requests, the government of China simply continued to

claim, without support, that neither the respondent nor its customers used the Program. *Id.* (citing Gov't of China Supp. Quest. Resp. at 4).

III.   <u>Benchmark Data To Measure Less Than Adequate Remuneration</u>

Both petitioner and Yinfeng submitted proposed benchmark data for ocean freight expenses for the provisions of sawnwood and plywood. *See* Petitioner Benchmark Submission at Exhibits 5 and 9A, dated May 11, 2020; Yinfeng Benchmarks at Exhibit 1, dated May 11, 2020; Yinfeng Supp. Quest. Resp. 1 at Exhibit SQ2-3. Yinfeng also submitted proposed benchmark data to measure the adequacy of remuneration for the provision of land-use rights. *See* Yinfeng Benchmark Submission at Exhibits 8-10, dated May 11, 2020.

On June 4, 2020, Commerce initiated investigations of petitioner's new subsidy allegations on the provision of primer, including gesso, for less than adequate remuneration, and requested factual information from the parties to determine whether acrylic polymer was considered to be or could be used as a primer. *See* New Subsidy Allegation Decision Memorandum (Dep't of Commerce June 4, 2020) (P.R. 272), (C.R. 147); *see also* Petitioner's Letter, "New Subsidy Allegations," dated May 6, 2020 (P.R. 246) (NSA Allegation). In response, petitioner

provided industry definitions and products for sale that indicated that

acrylic polymers were considered primers by industry standards and

used as a coating for wood products.  *See* Petitioner NFI Submission

(P.R. 441) (C.R. 184) at Exhibits 1-3.  Yinfeng, however, argued that

acrylic polymer could not be used as a stand-alone primer and was

instead a raw material for the production of gesso. *See* Yinfeng NFI

Submission (P.R. 441) (C.R. 184) at Exhibits 1-7.

IV.   Preliminary Determination And Post-Preliminary Decision
      Memorandum

On June 12, 2020, Commerce published its preliminary

determination.  *See Wood Mouldings and Millworks Products from*

*China: Preliminary Affirmative Countervailing Duty Determination and*

*Alignment of Final Determination with Final Antidumping Duty*

*Determination*, 85 Fed. Reg. 35,900 (June 12, 2020) (P.R. 273), and

accompanying PDM (P.R. 274).  Commerce explained that the Export

Buyer's Credit Program is administered by state-owned banks, such as

the Ex-Im Bank of China, and provides loans at preferential rates to

customers for the purchase of exported goods from China.  PDM at 16-

17.  Accordingly, Commerce determined that the Program is

countervailable, and thus applied facts available with an adverse

inference because the government of China repeatedly refused to provide the requested information necessary to allow Commerce to analyze the program fully. *See* PDM at 14. This complete lack of cooperation prevented Commerce from verifying claims of non-use. *See id.* Commerce explained that although Yinfeng reported no receipt of Export Buyer's Credit benefits and submitted certifications of non-use from its customers, "the {government of China} is the only party that can answer questions about the internal administration of {the} program, and thus, absent the requested information, the {government of China's} and respondent company's claims of non-use of this program are not verifiable." PDM at 15. Consequently, Commerce determined that resort to facts available was appropriate. IDM at 26. Commerce further explained that the government of China failed to cooperate by not acting to the best of its ability in responding to Commerce's specific requests for such information, and that an adverse inference was warranted. *See* PDM at 15.

Commerce also selected benchmarks to measure the adequacy of remuneration for the provision of sawnwood and plywood programs. *See* PDM at 28-33. Because neither the petitioner nor Yinfeng provided

benchmark data containing the actual shipping routes used by the respondent, Commerce relied on an average of all the data submitted by the parties to establish an ocean freight benchmark price reflective of the world market price. *See* PDM at 33-34. Thus, Commerce used the Maersk and Descartes freight price datasets submitted by Yinfeng, and the Descartes dataset submitted by petitioner. IDM at 62; PDM at 33-34.

Commerce also stated that it could not rely on tier-one (market) or tier-two (world market) benchmark prices to measure the adequacy of remuneration for the provision of land-use rights in China. *See* PDM at 31-32. For these benchmark benefits related to respondent's purchases of land-use rights, Commerce instead relied on data from the "Asian Marketview Reports" by CB Richard Ellis (CBRE) for Thailand for 2010 and inflation data from the International Monetary Fund for Thailand. *See* PDM at 31-32. This decision was based on the same considerations used in previous countervailing duty investigations—including national income levels, population density, and producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production. *See id*.

In October 2020, Commerce released its post-preliminary decision memorandum in which it determined that acrylic polymer could be used as a primer input, and therefore, Commerce included acrylic polymer purchases in the benefit calculation for the provision of primer program. *See* Post-Preliminary Decision Memorandum at 13-15 (Dep't of Commerce October 19, 2020) (P.R. 456).

V.    Final Determination

On December 28, 2020, Commerce published its final determination. *See id. Final Determination* (P.R. 484).  In the final determination, Commerce continued to find it was unable to verify non-use of the Export Buyer's Credit Program by Yinfeng and its U.S. customers.  IDM at 15-31.  Commerce made this determination based on the government of China's refusal to provide necessary information that only it could provide.  *Id.*  Accordingly, Commerce continued to apply adverse facts available to find the program countervailable.  *Id.*

Commerce also continued to find that acrylic polymer could be used as a primer input, and therefore, Commerce included acrylic polymer purchases in the calculation of the provision of primer program.  IDM at 50-52.  Commerce averaged the different

commercially available world market price datasets provided by
Yinfeng and the petitioner, after removing unsupported shipping route
estimates from the universe of prices it used to calculate the ocean
freight benchmark.  IDM at 6; 62.  Finally, consistent with the
preliminary determination and prior countervailing duty investigations,
Commerce continued to rely on 2010 Thai land prices as reported in the
CBRE "Asian Marketview Reports," after adjusting for inflation, as the
land-use benchmark.  IDM at 57-59.  Commerce assigned a final
countervailing subsidy duty rate of 20.56 percent to Yinfeng.  *See Final
Determination*, 86 Fed. Reg. at 68.

## SUMMARY OF THE ARGUMENT

Commerce's final determination is supported by substantial
evidence and in accordance with law, and therefore, should be
sustained.  The government of China did not cooperate to the best of its
ability when it failed to provide information requested, and as a result,
Commerce was unable to verify claims of the mandatory respondent's
non-use of the Export Buyer's Credit Program.  Although Yinfeng
argues that its assertions of non-use were sufficient record evidence for
Commerce to find that neither Yinfeng nor its customers used the

Export Buyer's Credit Program, Commerce must verify such information.  To be able to verify these non-use claims, Commerce must have a complete understanding of how the Program is administered. The government of China, however, refused to provide Commerce with any of the requested necessary information.  Commerce, therefore, reasonably applied adverse facts available to find the program countervailable because of the government of China's refusal to cooperate with the investigation.

Further, Commerce's inclusion of acrylic polymer in the provision of primer, including gesso, for less than adequate remuneration program is supported by substantial evidence and otherwise lawful. Commerce properly initiated on the provision of primer program based on information "reasonably available" to the petitioner.  Examining whether acrylic polymer could be considered or used as a primer input is not an unlawful expansion of the primer program because Commerce has the authority to examine the scope of inputs for a program during its investigation.  Substantial evidence supports Commerce's determination that acrylic primer could be used as a primer, and thus,

Commerce's inclusion of acrylic polymer purchases in the provision of primer for less than adequate remuneration program is lawful.

In addition, Commerce's reliance on the average of Maersk and Descartes freight price datasets submitted by Yinfeng and the Descartes dataset submitted by petitioner to calculate a tier-two (world market) ocean freight benchmark price for the provision of sawnwood and plywood programs is supported by substantial evidence and otherwise lawful.  Although Yinfeng argues that Commerce should have excluded the petitioner's Descartes data, the record lacks support for Yinfeng's contentions that the data contain atypical surcharges and do not reflect "prevailing market conditions."  Indeed, Commerce had no basis to exclude the petitioner's Descartes data, which contained commercially available routes, and therefore, Commerce's ocean freight benchmark should be sustained.

Finally, Commerce's selection of land benchmark data should be sustained because, consistent with past countervailing duty investigations, Commerce reasonably relied on 2010 Thai prices as reported by the CBRE "Asian Marketview Reports," after adjusting for

inflation.  Additionally, Commerce performed a thorough analysis of factors beyond contemporaneity and gross national income (GNI).

## ARGUMENT

### I.   Standard Of Review

In reviewing Commerce's antidumping or countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).   Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding

from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted).

Moreover, this Court affords Commerce "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Fujitsu*, 88 F.3d at 1039.  The Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007),

and the Court will not substitute its judgment for that of Commerce in

choosing between two fairly conflicting views, even though it could

justifiably have made a different choice had the matter been before it *de

novo*. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323,

1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp.

300, 306 (Ct. Int'l Trade 1988) (Court will not "weigh the adequate

quality or quantity of the evidence for sufficiency").

II.    Commerce Lawfully Made An Adverse Inference In Determining
       That Yinfeng Used The Export Buyer's Credit Program

Commerce lawfully determined, through the application of an

adverse inference in selecting from among the facts otherwise available,

that the record does not support a finding of non-use of the Export

Buyer's Credit Program.  Yinfeng claims that Commerce's

determination is unsupported by substantial evidence and unlawful.

*See* Yinfeng Br. at 5-19.  The record, however, demonstrates that

Commerce repeatedly requested information necessary for the

investigation from the government of China.  IDM at 20-30.  Commerce

could not obtain this information from any other source.  *Id.*  Instead of

cooperating though, the government of China unequivocally refused to

provide the requested information.  *Id.*  As a result, Commerce had no

verifiable understanding of the Export Buyer's Credit Program, and thus could not determine whether Yinfeng or its U.S. customers benefited from the Program.  *Id.*  Commerce explained in detail the information missing from the record, the necessity of the information, and how lack of that information affects Commerce's ability to verify non-use of the Program.  Accordingly, substantial evidence supports Commerce's application of adverse facts available.

A.   <u>Legal Framework</u>

Commerce applies facts otherwise available to fill gaps in the record if "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), or if an interested party:  (a) withholds information requested by Commerce; (b) fails to provide the information in the form or in the manner requested; (c) significantly impedes the proceedings; or (d) provides information that cannot be verified.  19 U.S.C. § 1677e(a)(2)(A)-(D).  During a countervailing duty proceeding, Commerce may select a rate with which to countervail a subsidy program by applying an adverse inference from among the facts otherwise available when Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with

{its} request for information."  19 U.S.C. § 1677e(b).  When applying an

adverse inference, Commerce may rely on information derived from any

stage of the proceeding, including the petition, a final determination in

the investigation, any previous review, or any other information placed

on the record.  19 U.S.C. § 1677e(b); *see also* 19 C.F.R. § 351.308(c).

Commerce may lawfully apply an adverse inference based upon

the government of China's failure to provide requested information,

even where the respondent cooperates.  *See, e.g.*, *KYD, Inc. v. United

States*, 607 F.3d 760, 768 (Fed. Cir. 2010) (finding that a collateral

impact on a cooperating party does not render the application of adverse

inferences in a countervailing duty investigation improper); *Fine

Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371-73

(Fed. Cir. 2014) (affirming Commerce's application of adverse inferences

when China did not provide requested information despite the

respondents' cooperation).

An interested party fails to act to the best of its ability when it

does not exert "*maximum effort* to provide Commerce with full and

complete answers to all inquiries in an investigation."  *Nippon Steel

Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis

added).  To avoid the application of adverse facts available, respondents "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question." *Papierfabrik August Koehler SE v. United States,* 843 F.3d 1373, 1379 (Fed. Cir. 2016) (citing *Nippon Steel Corp.*, 337 F.3d at 1382).

In the context of the Export Buyer's Credit Program, the Court has held that, "to apply an adverse inference that a cooperating party benefited from the {program} based on the {government's} failure to cooperate, Commerce must:  (1) define the gap in the record by explaining exactly what information is missing from the record necessary to verify non-use; (2) establish how the withheld information creates this gap by explaining why the information the {government} refused to give was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify."  *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d 1317, 1333 (Ct. Int'l Trade 2019) (citing *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316, 1326-27 (Ct. Int'l Trade 2018)).

In countervailing duty proceedings, Commerce requires information from both the respondent foreign government in question and the respondent foreign producers or exporters.  "Typically, foreign governments are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients." *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1297 (Ct. Int'l Trade 2010), *aff'd in part, rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012).  Commerce may use an adverse inference, even if doing so may "have collateral consequences for a cooperating party." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1373 (Ct. Int'l Trade 2018) (citing *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1236 (Fed. Cir. 2014)).  "Cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions," but "this is not contrary to the statute or its purpose, nor is it inconsistent with this court's precedent." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014).

B.     Commerce Lawfully Applied Facts Available With An
       Adverse Inference To The EBC Program As A Result Of The
       Government Of China's Failure To Cooperate

In the final determination, Commerce concluded that the

government of China withheld necessary information about the Export

Buyer's Credit Program, which significantly impeded the proceeding.

IDM at 26.  Thus, Commerce reasonably relied on adverse facts

available to find that Yinfeng used the Export Buyer's Credit Program.

Yinfeng argues that Commerce erred in applying adverse facts

available because there was no gap of information in the record

regarding use of the program, and the government of China

corroborated Yinfeng's and its customers' non-use claims.  Yinfeng Br.

at 9-10.  Yinfeng further asserts that "record evidence only contains

evidence of non-use."  *Id.* at 5.  To the contrary, the record supports

Commerce's finding that the government of China withheld necessary

information.

As an initial matter, the government of China refused to provide

the 2013 revised administrative measures for the Program, which

significantly changed certain provisions of the program from the 2000

measures.  IDM at 19-22; PDM at 14.  In its initial questionnaire

response, the government of China provided the 2000 administrative measures. IDM at 21 (citing Gov't of China In. Quest. Resp. at Exhibit EXPORT-2). Record information, however, indicates that the government of China revised the administrative measures in 2013. IDM at 21 (citing Gov't of China In. Quest. Resp. at Exhibit EXPORT-1); *see also* IDM at 19-20, PDM at 14. Under these revised measures, the China Ex-Im Bank may disburse export buyer's credits directly or through third-party partner or correspondent banks. IDM at 21, 23 (stating that the record indicates that the loans associated with the Export Buyer's Credit Program are not limited to direct disbursements through the China Ex-Im Bank) (citing Gov't of China In. Quest. Resp. at Exhibit EXPORT-1)). Additionally, record evidence indicates that the 2013 revisions likely removed the $2 million minimum business contract requirement identified in the 2000 Administrative Measures, which Commerce had previously used to verify non-use of the Program. IDM at 21.

Despite requests from Commerce, the government of China twice refused to provide the requested revised 2013 administrative measures. IDM at 21-22 (citing Gov't of China  Supp. Quest. Resp. at 5; Gov't of

China In. Quest. Resp. at EXPORT-2).  First, the government of China refused to provide the information in its initial questionnaire response. IDM at 22 (quoting Gov't of China Supp. Quest. at 4).  Then, in its supplemental questionnaire response, it failed to even acknowledge Commerce's direct request to "submit the 'Administrative Measures' relating to the Export Buyer's Credit program, which were revised in 2013," and instead referred Commerce to its initial questionnaire response which did not include the 2013 revisions.  *Id.*  Notably, the government of China has provided related information for other programs, even though it considered the information not to be applicable to the issue under examination.  IDM at 23.

In response, Yinfeng argues that Commerce based its findings on the government of China's failure to submit the 2013 revisions and ignored record evidence that the government of China confirmed the non-use claims with the China Ex-Im Bank by searching its records to ensure that none of the respondents used the Export Buyer's Credit Program credits during the period of investigation.  Yinfeng Br. at 9. The government of China, however, refused to provide responsive information to verify the assertion that it had confirmed non-use with

27

the China Ex-Im Bank.  PDM at 15.  Instead, the government reported

that the China Ex-Im Bank searched its database for the U.S. importers

provided by the respondent and did not find any of the listed companies

in its database.  *Id.*  In making this assertion, however, the government

of China failed to provide any documentation to support either that the

search was conducted, or upon what basis.  *Id.*  Specifically, it failed to

provide any evidence of this data query, how the query was performed,

or other underlying information including "documents, databases,

accounts, *etc*. that were examined to determine there was no use."  PDM

at 15.

Yinfeng in its brief also alleges that Commerce ignored "customer

declarations of non-use from every single U.S. customer to whom they

exported during the {period of investigation.}"  Yinfeng Br. at 9, 13-14.

Commerce did not ignore this record evidence.  Rather, Commerce

explained that because of the Export Buyer Credit Program's

complexities and uncertainties, verification of customer certifications

could not establish that Yinfeng did not use the program.  IDM at 28-

29.  Commerce cannot simply rely on unverifiable assurances or the

government of China's unsupported representations that it has checked

28

its records because Commerce has no way of verifying such statements. IDM at 29; PDM at 15.  Rather, the government of China must provide Commerce with the information and documentation that would allow Commerce to "properly examine its claims of non-use." *Id.*  Without the necessary information requested, Commerce is unable to verify in a meaningful manner the information provided on the record. *Id.* at 26-36.  The purpose of verification is "to verify the accuracy and completeness of submitted factual information."  19 C.F.R. § 351.307(d). As this Court and the Federal Circuit have recognized, verification is not a fact-finding mission. *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1349 (Ct. Int'l Trade 2015), *aff'd*, *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017).  Rather, "{v}erification represents a point of no return" and "{t}he purpose of verification is to test information provided by a party for accuracy and completeness." *Goodluck India Ltd. v. United States*, 11 F.3d 1335, 1343-44 (Fed. Cir. 2021) (quotation and citation omitted).

To verify the conclusory statements made by the government of China, Commerce requested a list of all partner/correspondent banks involved in the disbursement of funds under the credit program.  IDM

at 21; PDM 14.  The government of China again claimed that the question was not applicable, and that the government could not compel the Ex-Im Bank to disclose a list of all partner or correspondent banks that may have been involved in the disbursement of funds under the Program.  IDM at 23 (quoting Gov't of China Supp. Quest. Resp. at 6); PDM 14.  Commerce explained in its *Final Determination* that this information is necessary for verification because the China Ex-Im Bank may disburse funds through third party banks.  IDM at 23-24. Specifically, Commerce stated that customers could open loan accounts for disbursements through the Program with other banks, those funds could be "sent from the China Ex-Im bank to the importer's account, which could be at the China Ex-Im Bank or other banks" and those funds could then be "sent to the exporter's bank account."  IDM at 23-24.

Thus, this list of correspondent banks is critical for Commerce to verify non-use of the Program given the complicated structure of the credit disbursements.  IDM at 24-25, 24.  For Commerce to perform the verification steps to determine whether the "manufacture, production, or export" of respondent's merchandise has been subsidized" and

involved intermediary banks and indirect transactions from the China Ex-Im Bank to the exporter's customers, Commerce must know the names of the intermediary banks because "it would be their names, not the name 'China Ex-Im Bank,' that would appear in the subledgers of the U.S. customers if they received the credits." *Id.*

Commerce explained that, "{w}ithout such information, it would be unreasonably onerous for Commerce to comb through the business activities of the company respondent's customers without any guidance as to how to simplify the process or any guidance as to which loans or banks should be subject to scrutiny as part of a verification for each company." *Id.* at 25. And even "{a} careful verification of {Yinfeng's} customers' non-use of this program without understanding the identity of these correspondent banks would be extremely difficult, if not impossible," in part, "{b}ecause Commerce does not know the identities of these banks." *Id.* Without knowing the identities of the banks, Commerce "could not by itself demonstrate that the U.S. customers did not use the program (i.e., by examining whether there were any correspondent banks in the subledger)." *Id.* Accordingly, Commerce could not "narrow down the company's lending to a subset of loans

likely to be the export buyer's credits." *Id.* Thus, Commerce decided that "verifying non-use of the program without knowledge of the correspondent banks would require Commerce to view the underlying documentation for all entries from the subledger to attempt to confirm the origin of each loan—i.e., whether the loan was provided from the China Ex-Im Bank via an intermediary bank." *Id.* (emphasis added). Such a process would be an extremely onerous undertaking for any company that received more than a small number of loans. *Id.* Commerce analogized this problem as looking for a "needle in a haystack" but that without the requested information from the government of China, Commerce was faced with the "added uncertainty that Commerce might not even be able to identify the needle when it was found." *Id.* at 26.

Notwithstanding the lack of knowledge into the correspondent banks, Commerce explained that even were it to attempt to verify Yinfeng's non-use of the Export Buyer's Credit Program by examining each loan received by Yinfeng's U.S. customers, it still would not be able to verify which loans were normal loans versus Program loans. *Id.* Because the government of China failed to provide Commerce a sample

application and other documents constituting the "paper trail" of direct or indirect export credit from the China Ex-Im Bank, Commerce explained that it cannot know what underlying documentation it would expect to review, and whether or how that documentation would indicate China Ex-Im Bank involvement. *Id.* at 25-26. Thus, in theory, companies could provide Commerce with incomplete Export Buyer Credit Program loan documentation without Commerce even understanding that the loan documentation was incomplete. *Id.* at 26.

"Even if such documentation were complete, and identified China Ex-Im Bank involvement, without a thorough understanding of the program, Commerce might not recognize indicia of such involvement." *Id.* at 26. This is precisely the reason why Commerce requires disclosure of the 2013 Administrative Measures, and other information concerning the operation of the Export Buyer's Credit Program to verify usage. *Id.* A complete understanding of the Program "provides a 'roadmap' for the verifiers by which they can conduct an effective verification of usage." *Id.* Thus, "Commerce could not *accurately and effectively* verify usage" of the Program, regardless of whether it were to attempt the unreasonably onerous examination of loans. *Id.*

Commerce also explained that its typical non-use verification procedures, such as selecting specific entries from a subledger and requesting to see underlying documentation, would be of no value because this step might only confirm whether banks were correctly identified in the subledger, not necessarily whether those banks were correspondent banks participating in the Program. *Id.* at 24-25. Yinfeng's and its customers' non-use claims could not be verified "in a manner consistent with Commerce's verification methods because Commerce could not confirm usage or claimed non-use by examining books and records which can be reconciled to audited financial statements or other documents, such as tax returns." *Id.* at 27. And with the disbursement information "only known by the originating bank, the China Ex-Im Bank, which is a government {of China}-controlled bank," "{w}ithout cooperation from the China Ex-Im Bank and/or the government of China, {Commerce} cannot know the banks that could have disbursed export buyer's credits to {Yinfeng's} customers." *Id.* at 28. As such, Commerce found that "required missing information concerning the operation and administration of the Export Buyer's Credit Program is necessary because its absence from the

record demonstrates why usage information provided by the
government of China and {Yinfeng} cannot be verified and, thus, why
there is a gap in the record concerning usage." *Id.* at 28.  And although
the government of China "assur{ed}" Commerce that it checked its
records, Commerce has "no way of verifying such statements without
the government of China providing {it} with the requested documents
which would allow {Commerce} to then properly examine its claims of
non-use." *Id.* at 29.

Finally, Commerce explained that only the withheld information
could fill the gap.  For example, even if Commerce reviewed "ancillary
documents, such as applications, correspondence, emails, etc., {this
information would be} insufficient for Commerce to verify any bank
disbursement or loan amount pertaining to the company respondent, its
customers, and/or the {government of China's} participation in the
program." *Id.* at 27.  "Additionally, despite company certifications of
non-use, Commerce f{ound} that it is not possible to determine whether
export buyer's credits were received with respect to the export of subject
merchandise because the potential recipients of export buyer's credits
are not limited to the customers of the company respondent, as they

may be received by third-party banks and institutions, as noted above."
*Id*. at 24.  And even when Commerce has "no means of limiting the
universe of transactions before it begins verification, Commerce knows
what it is looking for when it begins selecting documents or
transactions for review," but with respect to the Export Buyer's Credit
Program, "there are no such parameters, or there is no guidance as to
what indicia Commerce should look for{.}"  *Id*. at 29.  Thus, Commerce
explained that the government of China failed to cooperate to the best
of its ability by not fully answering Commerce's questions, despite being
the sole party in possession of such information.  *See* IDM at 30-31; *see
also Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp.
3d 1334, 1355 (Ct. Int'l Trade 2016).

Accordingly, Commerce thoroughly explained that because of the
program's complexities, customer certifications without the necessary
information that only the government of China could provide, do not
provide a record basis to support non-use, and there is thus a gap of
missing information in the record to support non-use.  IDM at 20-30.

Notwithstanding more recent opinions to the contrary, this Court
previously has held that "only the government of China, and in

particular the {China} Ex-Im {Bank}, could provide and verify the information needed to determine whether a benefit was conferred to Respondents during the {period of review} from the {Ex-Im Bank's} Export Buyer's Credit Program." *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 195 F. Supp. 3d 1334, 1355 (Ct. Int'l Trade 2016) (*Trina Solar*).  In *Trina Solar*, the Court explained that "{b}ecause the government of China—the sole party with access to the necessary information—submitted information that could not be verified, and failed to act to the best of its ability by preventing Commerce from verifying this information, Commerce reasonably applied 19 U.S.C. §§ 1677e(a)(2)(D) and 1677e(b)." *Id.*  In addressing the verification of non-use of the Export Buyer's Credit Program on remand in another review following the revision of the program guidelines in 2013, the Court has held that Commerce's finding of non-use, based on the failure of the government of China to provide the requested documentation, was supported by record evidence.  *See RZBC Grp. Shareholding Co. v. United States,* 222 F. Supp. 3d 1196, 1199-1203 (Ct. Int'l Trade 2017).

Where this Court has set aside Commerce's determination as being unsupported by substantial evidence regarding the Export

Buyer's Credit Program, it has generally done so where the respondent

had in fact provided the necessary information, or where Commerce

failed to detail why the information would be necessary.  *See, e.g.*,

*Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d

1287, 1291-93 (Ct. Int'l Trade 2020) (sustaining on remand

determination that respondents did not use program where Commerce

did not ask any questions to attempt verification); *Clearon Corp. v.

United States*, 474 F. Supp. 3d 1339, 1353 (Ct. Int'l Trade 2020)

(holding on remand that substantial evidence did not support applying

adverse facts available where Commerce did not analyze whether the

missing information actually impacted its ability to verify); *Guizhou

Tyre Co., Ltd. v. United States*, 399 F. Supp. 3d 1346, 1349-53 (Ct. Int'l

Trade 2019) (holding application of adverse facts available to determine

use and benefit was unsupported by substantial evidence where

Commerce failed to explain why information was necessary); *Guizhou

Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1270 (Ct. Int'l

Trade 2018) (finding lack of substantial evidence where Commerce

failed to make initial finding that claimed missing information would be

necessary).  Contrary to these cases, here Commerce did in fact detail

38

what information it needed, in particular the revised administrative measures, names of participating banks, and examples of loan documentation.  Importantly, there is no binding precedent from the United States Court of Appeals for the Federal Circuit on this issue.

In sum, the government of China's failure to provide requested information to Commerce resulted in a gap in the record concerning the respondents' usage of the Export Buyer's Credit Program.  IDM at 27-29.  As Commerce explained, this gap "prevents complete and effective verification of the respondents' customers certifications of non-use." IDM at 28.  Therefore, because of the government's failure to provide information about the program, Commerce's limited understanding of the operation of the program did not permit Commerce to verify non-use, even with customer declarations.[2]

Accordingly, Commerce appropriately relied on adverse facts available to determine that the record does not support a finding of non-use of the Export Buyer's Credit Program because China did not

---

[2] Yinfeng incorrectly states that Commerce did not expressly invoke 19 U.S.C. § 1677e(a)(2)(D) in performing its adverse facts available analysis.  Yinfeng Br. at 7-8.  To the contrary, Commerce did in fact expressly invoke 19 U.S.C. § 1677e(a)(2)(D)in its analysis.  *See* IDM at 28.  Additionally, Yinfeng correctly asserts that Commerce relied on the inability to verify rationale as part of its adverse facts available analysis. Yinfeng Br. at 8.

cooperate.  This lack of cooperation directly led to Commerce's inability
to verify whether the program was used.  Therefore, Commerce's
determination is supported by substantial evidence and otherwise in
accordance with law.

III. **Commerce's Inclusion Of Acrylic Polymer In The Provision Of Primer, Including Gesso, Program Is Supported By Substantial Evidence And Otherwise Lawful**

Commerce properly included acrylic polymer purchases, such as
those made by Yinfeng's cross-owned producer, in the provision of
primer program.  *See* IDM at 50.

A. Legal Framework

By statute, a subsidy is countervailable when an authority has
provided financial contribution to a person, a benefit is thereby
conferred, and the subsidy is specific.  *See* 19 U.S.C. § 1677(5)(A)-(B).
When considering whether a good or service has been provided "for less
than adequate remuneration," and, thus, whether a benefit has been
conferred, Commerce examines "prevailing market conditions for the
good or service being provided," including "price, quality, availability,
marketability, transportation, and other conditions of purchase or sale."
Commerce measures the adequacy of remuneration by comparing the
respondent's actual price paid for an input to an adjusted benchmark

40

figure that represents the market price for the good at issue.  19 C.F.R.

§ 351.511(a)(2).

Commerce's benchmarking regulations provide a three-tiered

hierarchal framework for this analysis.  *See* 19 C.F.R. § 351.511.  As

explained by the Federal Circuit, first Commerce looks for "an actual

transaction price in the country in question, which may, in some cases,

include sales by competitively-run government auctions." *Essar Steel*

*Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012) (citing §

351.511(a)(2)(i)).  If such a transaction does not exist, Commerce then

looks for "a world market price for the goods in question." *Id.* (citing

§ 351.511(a)(2)(ii)).  Finally, if neither is available, Commerce then

"measures the adequacy of the remuneration by assessing whether the

price is consistent with market principles." *Id.* (citing

§ 351.511(a)(2)(iii)).

As reflected by this hierarchy, Commerce prefers to derive a

benchmark to measure the adequacy of remuneration for an input from

market-determined prices in the country in question.  19 C.F.R.

§ 351.511(a)(2)(i).  However, when "actual transaction prices are

significantly distorted as a result of {a} government's involvement in the

market{,}" Commerce's practice is to "resort to the next alternative in the hierarchy" (*i.e.,* a world market or tier-two price). *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't of Commerce Nov. 25, 1988) (final rule). Commerce resorts to a tier-two benchmark; that is, a benchmark from a world market price for the input in question if "it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). Where there is more than one world market price available on the record, Commerce will average the prices to the extent practicable. 19 C.F.R. § 351.511(a)(2)(ii). However, "{i}f there is no world market price available to purchasers in the country in question, {Commerce} will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii). If the government price is inconsistent with market principles, Commerce selects an external or third-tier benchmark.

When applying a benchmark, Commerce "will adjust the comparison price {(*i.e.*, the benchmark)} to reflect the price that a firm actually paid or would pay if it imported the product. Thus, the

adjustment will include delivery charges and import duties."  19 C.F.R.

§ 351.511(a)(2)(iv).

### B. Commerce Correctly Included Acrylic Polymer In The Provision Of Primer Program

Where a domestic industry's petition for relief alleges the

elements necessary for the imposition of countervailing duties—namely

financial contribution, benefit, and specificity—Commerce must initiate

a countervailing duty investigation.[3]  *See* 19 U.S.C. § 1671a(b)(1); *see*

*also* 19 U.S.C. §§ 1671(a) *et seq*.  Commerce applies this same initiation

standard to both subsidies alleged in the petition for a new

investigation, and to new subsidies alleged during the investigation.

*See, e.g., Dynamic Random Access Memory Semiconductors from the*

*Republic of Korea*, 72 Fed. Reg. 7,015 (Dep't of Commerce Feb. 14, 2007)

and accompanying IDM at Comment 4 (explaining the initiation

standard for new subsidy allegations is the same as the initiation

standard found in 19 U.S.C. § 1671a for subsidy allegations made in a

---

[3]  As discussed above, 19 U.S.C. § 1677(5)(B) provides that a subsidy shall be deemed to exist if:  (1) there is a financial contribution by a government or a government entrusts or directs a private party to make a financial contribution to an entity, and (2) a benefit is thereby conferred.  To be countervailable, the subsidy must also be specific within the meaning of section 1677(5A).  Thus, when submitting a subsidy allegation, petitioners must allege all three elements necessary for the subsidy to be countervailable.

petition).  Petitions alleging new subsidies during the investigation must be accompanied by information "reasonably available" to petitioners that supports the allegation.  19 U.S.C. § 1671a(b)(1). Additionally, Commerce must "examine the accuracy and adequacy of the evidence provided in the {allegation}."  19 U.S.C. § 1671a(c)(1)(A); 72 Fed. Reg. 7,015.

Here, the petitioner made a new subsidy allegation with respect to the provision of primer, alleging that Yinfeng received inputs from the government of China for less than adequate remuneration for the program.  This allegation was specific to Yinfeng's domestically purchased acrylic polymer.  Commerce thus initiated on the provision of primer program based on the information "reasonably available" to petitioner.

Yinfeng does not claim Commerce failed to properly initiate an investigation into the "provision of primer, including gesso, (primer) for less than adequate remuneration."  *See generally,* Yinfeng Br. at 19-30; *see also* Post-Preliminary Decision Memorandum at 1.  Instead, Yinfeng contends that Commerce's inclusion of acrylic polymer in the primer program unlawfully expanded the scope of the primer program.

44

Yinfeng Br. at 20; 28.  According to Yinfeng, the petitioner never alleged, and Commerce "never initiated on a program including acrylic polymer; therefore, {Commerce} lacks the authority to determine that a Chinese Government 'authority' conferred a benefit for purchases of acrylic polymer."  *Id.*  Yinfeng's contention lacks merit.

On May 6, 2020, petitioner filed a new subsidy allegation on the provision of "primer, including gesso."  NSA Allegation.  According to petitioner, "{b}oth gesso and other primers are often applied to wood mouldings and millwork products, and they may be used by the mandatory respondent in this investigation to coat and finish its subject merchandise."  *Id.*  Petitioner also stated that the government of China provides "primer, including gesso" to the mandatory respondent, constituting a "financial contribution" pursuant to 19 U.S.C. § 1677(5)(D)(iii).  *Id.* at 8-10.  Thus, petitioner provided data that Chinese producers of wood mouldings and millwork were likely receiving "discounted gesso and other primers."  *Id.* at 10-11.

Based on this information, Commerce initiated an investigation into whether the mandatory respondent received a benefit from the government of China for less than adequate remuneration, in the form

of primer.  During this investigation, Commerce found, as supported by

substantial record evidence including evidence of industry standards,

that acrylic polymer could be used as a primer input.  *See* IDM at 50-51;

*see also* NSA Memorandum.  Following its initiation on the provision of

primer—including gesso—program, Commerce requested factual

information from parties to determine whether acrylic polymer as a

stand-alone product—which is what Yinfeng uses—could be considered

or used as a primer.  *See* IDM at 50; 52 (citing to Memorandum,

"Deadline to Submit Factual Information," dated September 22, 2020

(NFI Memorandum) (requesting factual information "regarding whether

or not acrylic polymer can be considered a primer and should be

included in Commerce's calculation of the benefit under the primer,

including gesso, for less than adequate remuneration program.")); *see*

*also* Post-Preliminary Decision Memorandum at 12 ("To clarify whether

acrylic polymer was considered a primer by millwork products industry

standards, we requested interested parties to provide factual

information regarding acrylic polymer.").  Commerce specifically

requested clarifying information, *i.e.*, "{f}actual information regarding

whether acrylic polymer can be utilized as a primer without further

46

processing or is considered to be a primer by millwork products industry standards. Such information may include industry definitions, product lists, and/or other relevant supporting documentation." NFI Memorandum at 1.

The petitioner provided industry definitions and products for sale generally indicating that single-ingredient acrylic polymers, such as those that Yinfeng's cross-owned producer, Mangrove, purchased, are considered primers by industry standards and are used as a coating for wood products. *See* IDM at 50; *see also* Post-Preliminary Decision Memorandum at 12 (citing Petitioner NFI Submission at Exhibits 1-3). Additionally, the petitioner provided articles that indicate the multitude of uses and applications for acrylic polymer. *See* IDM at 51 (citing Petitioner NFI Submission at Exhibit 1).

In contrast, the record does not support Yinfeng's assertion that it provided "substantial information" showing that acrylic primer is not a primer, and that it could not be used as a primer. *See* Yinfeng Br. at 25; *see also* IDM at 51. Yinfeng submitted HTS information and CBP rulings finding that acrylic polymer was classified differently from primer/paint within the HTS system. IDM at 51; Post-Preliminary

Decision Memorandum at 12 (citing Yinfeng NFI Submission at Exhibits 4-8).  Yinfeng also submitted a signed statement from Mangrove's acrylic polymer supplier asserting, without supporting evidence, that acrylic polymers cannot be directly used as primer.  *Id*. Further, Yinfeng argued, without any factual support, that acrylic polymer could not be used as a primer without further processing.  *See* IDM at 50; *see also* Yinfeng NFI Submission at Exhibits 1-7.  In making this unfounded argument however, Yinfeng discussed only Mangrove's further processing of acrylic polymer to self-produce gesso.  *See id*. Finally, Yinfeng also submitted third-party information from various websites regarding the production of gesso and acrylic polymer's use in a number of applications, none of which demonstrate that acrylic polymer cannot be used as a primer without further processing.  *See* IDM at 51 (citing Yinfeng NFI Submission at Exhibits 1-3).

As Commerce explained, the record lacks specific information on the acrylic polymer Mangrove purchased and what further processing of acrylic polymer would be required for a *non-gesso* primer.  *See* IDM at 51.  Beyond the supplier's signed statement, the record lacks information to demonstrate that the acrylic polymer purchased by

Mangrove does not constitute a primer input.  *Id.*  Commerce explained in the *Final Determination* that after "After multiple requests for information, the only factual information on the record regarding the product Mangrove purchased was its {HTS} subheading and the corresponding description."  IDM at 51.  Commerce further found that Yinfeng's arguments regarding the HTS subheadings demonstrated only that "the acrylic polymer purchased was not classified as a paint." *Id.*  Even the CBP rulings provided by Yinfeng only "demonstrated that products under USHTS 3906.90 could include both granular inputs and finished products such as resin solutions, gels, or aqueous dispersions that could be used as additives, sealants, or coatings."  *Id.*  Thus, Commerce determined there was insufficient record evidence to find Yinfeng's reporting of its purchases under the particular HTS subheading was "conclusive of the product's usability as a primer."  *Id.*

Notably, the petitioner's new subsidy allegation, upon which Commerce initiated, contained information "reasonably available" to the petitioner.  *See* IDM at 51; *see also* NSA Allegation (P.R. 246). Indeed, the statutory standard for initiation of a subsidy program investigation does not require that *all* information accompany the

49

allegation.  Nor does the standard require that Commerce must initiate

only if *all* questions with respect to the input have been first resolved.

The statutory standard simply requires information "reasonably

available."  19 U.S.C. § 1671a(b)(1).  As Commerce explained in the

*Final Determination*:

> The petitioner met the standard of initiation by
> alleging and providing support documentation
> that the {government of China} made a financial
> contribution through the chemicals industry, of
> which 'synthetic chemicals' are clearly listed in
> supporting documentation.  While the petitioner
> did use paint {HTS} subheadings 3209.10 and
> 3209.90 to allege a benefit, there is no requirement
> that the petition include an exhaustive list of every
> type of input that could conceivably be covered by
> {a less than adequate remuneration} allegation { .
> . . . } {T}he standard for initiation is based on what
> is "reasonably available" to the petitioner, and
> does not preclude Commerce from determining the
> scope of purchases which may be considered inputs
> for the purpose of calculating a benefit during the
> course of an investigation.

IDM at 51-52 (omitting internal citations) (citing *Multilayered Wood*

*Flooring from China:  Preliminary Results of Countervailing Duty*

*Administrative Review, and Intent to Rescind Review, in Part; 2017*, 85

Fed. Reg. 6,908 (February 6, 2020), and accompanying PDM; unchanged

in *Multilayered Wood Flooring from China: Final Results and Partial*

*Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (November 27, 2020), and accompanying IDM).  Thus, as a result of Yinfeng's failure to rebut adequately with detracting record evidence petitioner's evidence, Commerce reasonably determined that acrylic polymer "could be used as an input without further processing" and that Yinfeng's domestically purchased acrylic polymer should be included in the primer program.  IDM at 50.

Simply because Commerce initiated an investigation on the provision of primer for less than adequate remuneration based on the petitioner's allegation without specific identification of acrylic polymer as a primer input, did not preclude Commerce from determining, during its investigation, that the scope of inputs for that program includes acrylic polymer.  *See* IDM at 52.  Nor does it render Commerce's examination of acrylic polymer to make this determination an unlawful expansion of the primer program.

Yinfeng incorrectly claims that by including acrylic polymer in the primer for the less than adequate remuneration investigation, Commerce unlawfully departed from its own precedent not to expand investigations to include upstream raw materials used to produce the

51

investigated product at less than adequate remuneration.  Yinfeng Br.

at 29-30 (citing *Fine Denier Polyester Staple Fiber from China:*

*Preliminary Affirmative Countervailing Duty Determination*, 82 Fed.

Reg. 51,396 (Dep't of Commerce November 6, 2017), and accompanying

IDM at Cmt. 4).  Yinfeng argues that in the *Fine Denier Polyester Staple*

*Fiber from China* investigation, Commerce faced a similar situation but

did not investigate the upstream raw materials and should not do so

here.  *Id.*

Contrary to Yinfeng's argument, Commerce did not depart from

its practice and found the *Fine Denier Polyester Staple Fiber from China*

investigation not to be analogous to this proceeding.  IDM at 50.  In that

investigation, Commerce determined that the respondent only self-

produced or imported an input, and that the input should not be

countervailed.  *Id.*  Here, however, record evidence demonstrates that

the acrylic polymer could be used as an input without further

processing, in addition to its function as a raw material to produce

gesso.  *Id.*  Thus, because the input here was not *only* used as a raw

material to produce gesso, Commerce reasonably determined that such

a practice did not govern these circumstances.  *Id*. at 50.  Accordingly,

Yinfeng's claim that Commerce unlawfully departed from Commerce's precedent should be rejected.

Finally, the World Trade Organization (WTO) agreements, including the WTO Agreement on Subsidies and Countervailing Measures, do not apply in proceedings before the U.S. Court of International Trade, which applies the law of the United States. *See Corus Staal BV v. United States*, 395 F.3d 1343, 1348 (Fed. Cir. 2008) (Fed. Cir. 2005). Likewise, "{n}o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect." 19 U.S.C. § 3512(a); *see also Corus*, 395 F.3d at 1348. As detailed above, Commerce has not acted inconsistent with U.S. law in its less than adequate remuneration investigation of the primer program. *See* IDM at 52 ("Commerce only determined if certain purchases were inclusive within the language of a properly initiated program.").

IV.    Commerce's Selection Of Benchmark Data For Ocean Freight And
       Land-Use Is Supported By Substantial Evidence And Otherwise
       Lawful

Substantial evidence supports Commerce's benchmark selections

for ocean freight and land-use, and the Court should therefore sustain

these selections.  To establish a 19 C.F.R. § 351.511(a)(2)(ii)

benchmark—a tier-two world market benchmark—for ocean freight,

Commerce reasonably relied on its calculation averaging the freight

routes on the record containing supporting documentation of

commercial availability.  Additionally, consistent with past

countervailing duty investigations, Commerce relied on 2010 Thai

prices for land contained in the CBRE "Asian Marketview Reports" for

use as a 19 C.F.R. § 351.511(a)(2)(iii) tier-three land-use benchmark

after considering a number of factors and other benchmark data on the

record.

A.    Commerce's Ocean Freight Benchmark Is Supported By
      Substantial Evidence And Otherwise Lawful

For the ocean freight benchmark, Commerce reasonably relied on

an average of Maersk and Descartes freight prices submitted by

Yinfeng and the Descartes dataset submitted by petitioner to

approximate the cost of shipping plywood or sawnwood from around the

world to China.  IDM at 61-63.  The Court should reject Yinfeng's arguments that Commerce erred by including in the average petitioner's submission of prices from Descartes.  *See* Yinfeng Br. at 30-34.

In this investigation, Commerce applied a tier-two (world market prices that would be available to purchasers in China) benchmark price in measuring the adequacy of remuneration for the provisions of plywood and sawnwood.  IDM at 62; PDM at 37.  To adjust for delivery charges, Commerce established the ocean freight benchmark by averaging the commercially available cost datasets on the record of the investigation.  *See* IDM at 62; PDM at 33-34; *see also* 19 C.F.R. § 351.511(a)(2)(ii).  Commerce found that the datasets, *i.e.*, the Maersk and Descartes datasets submitted by Yinfeng, and the Descartes dataset submitted by petitioner, constituted "usable world market prices with supporting documentation from shipping sources."  IDM at 62; PDM at 33-34.

Yinfeng argues that Commerce should have excluded petitioner's Descartes data because it fails to reflect the price that a firm would pay for ocean freight if importing plywood and, thus, does not reflect

prevailing market conditions.  Yinfeng Br. at 32.  Yinfeng first claims that the petitioner's Descartes data contains a rate for a 40 foot, 9'6" high cube shipping container which, Yinfeng asserts, is not typical for plywood shipments.  Yinfeng Br. at 32-33.  Commerce, however, concluded the record indicates the rate is for a 20-foot standard container.  IDM at 63.  In the *Final Determination*, Commerce explained that the petitioner-provided Descartes shipping data demonstrates that "the maximum payload weight of the container for the rate was 28,200 kilograms," which record evidence shows is "equivalent to the maximum payload of a 20-foot standard shipping container."  IDM at 63 (citing Petitioner Benchmark Submission at Exhibits 6 and 8).

Indeed, the petitioner provided Descartes ocean freight rate quotes for certain HTS commodity codes shipped in 20-foot standard containers with a maximum payload of 28,200 kilograms.  *See* Petitioner Benchmark Submission at Exhibit 6 (specifying Descartes rate quotes for "Ctr. Size: 20," "Hazard Code: NHZ" and "Weight: 28,200.000 KGS").  The petitioner also provided freight container payload information from Maersk which specifies the maximum payload

of a 20-foot standard container is 28,200 kilograms, and the maximum

payload of a 40-foot high container (*i.e.*, 40' x 9'6" container) is 28,620

kilograms.  *See* Petitioner Benchmark Submission at Exhibit 8

(providing a Maersk chart with dry freight container sizes and

corresponding specifications); *see also* Yinfeng Rebuttal Benchmark at

Exhibit 4 (providing container high cube shipping container

specifications for "20ft standard" and "40ft standard containers").

　　None of the information Yinfeng provided contradicted

Commerce's finding that the rate was for a 20-foot standard container.

*See id.*; *see also* IDM at 63.  Thus, Commerce reasonably concluded that

the available information on the record indicated that the rate

submitted by the petitioner is for a 20-foot standard container, and that

it received no factual information to the contrary.  Yinfeng's assertions

are thus not supported by the record.

　　Yinfeng next argues that the petitioner's Descartes data for

shipping plywood contain "numerous atypical charges" including weight

cargo and port congestion charges not reflective of prevailing market

conditions.  Yinfeng Br. at 33.  Commerce determined, however, that

the record lacked information to support that such charges are never

included or not routine.  *See* IDM at 62; *see also* 19 U.S.C.

§ 1677(5)(E)(iv).  Yinfeng asserts that its Maersk and Descartes data

submissions "have no indications of any unusual charges."  Yinfeng Br.

at 33.  The Descartes data provided by Yinfeng include "all-inclusive"

base freight rates; the petitioner's Descartes data include a charge

summary listing weight cargo and port congestion surcharges.

*Compare* Yinfeng Benchmark Submission at Exhibit 5 (accounting for

all-inclusive Descartes rates), *with* Petitioner Benchmark Submission

at Exhibit 6 (accounting for Descartes rates with itemized surcharges

including a weight cargo surcharge at "55.00 USD *Weight" resulting in

total weight surcharge of $1551.00 based on a shipment weight of

28,200 kilograms).

In the *Final Determination*, Commerce explained that Yinfeng's

ocean freight quotes demonstrate that weight cargo and port congestion

surcharges "may not be included," but "they do not demonstrate that

such surcharges are never included." IDM at 62.  Indeed, the

petitioner's data from Descartes demonstrate "that the routes in

question include the charges," and therefore, show "that such rates do

exist commercially."  IDM at 62.  Commerce further concluded that the

"fact that the ocean freight quotes submitted by the petitioner do include such surcharges suggests that the surcharges may or may not be charged by shipping companies depending on the circumstances of the shipment." *Id.* Further, Commerce found no evidence on the record to demonstrate the charges would not be paid. *Id.*

Importantly, the petitioner obtained its ocean freight benchmark data from the same source as Yinfeng (*i.e.*, Descartes). Accordingly, Commerce reasonably determined that the record from multiple sources demonstrates that service charges, fees, and fines are factors that can affect freight rates consistent with prevailing market conditions. *See* IDM at 62-63*; see also* Petitioner Benchmark Submission at Exhibit 5; Yinfeng Benchmark Submission at Exhibits 4 and 5; Yinfeng Rebuttal Benchmark Submission at Exhibit 2. Because Commerce could not "discount the probity of the ocean freight quotes submitted by the petitioner," Commerce reasonably included "the freight routes with surcharges, including additional charges included in the petitioner's ocean freight costs" in its ocean freight benchmark calculation. IDM at 63. Thus, this Court should reject Yinfeng's claim that the petitioner's Descartes data must be excluded from Commerce's ocean freight

average calculation because the record does not indicate that such surcharges are atypical.

Yinfeng also asserts that Commerce should have excluded the petitioner's Descartes data for failing to reflect "prevailing market conditions" because the route—Norfolk, Virginia to Tianjin, China—"is not a major shipping route." Yinfeng Br. at 34. Notably, Yinfeng cites to no authority or record evidence in support of its proposition that only major shipping routes with major world ports fulfill the statutory obligation of "prevailing market conditions." *See generally, id.* The statute specifies only that "prevailing market conditions" include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E)(iv). Commerce's tier-two benchmark regulation requires a world market price "where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii).

In the *Final Determination*, Commerce explained that "there is no evidence on the record that only major shipping routes would be used by exporters of sawnwood or plywood." IDM 63. Accordingly, Commerce reasonably disagreed that only major shipping routes are consistent

with prevailing market conditions.  IDM at 63.  Moreover, record

evidence indicates that Tianjin is a major world port. *See* IDM at 63

(citing Yinfeng Benchmark Submission at Exhibit 6).  Thus, Commerce

reasonably declined to exclude the petitioner's Descartes data where the

record supports the commercial availability of the routes and there is no

evidence that only major shipping routes would be used by relevant

exporters.  Yinfeng asks this Court to remand and require Commerce to

rely solely on the ocean freight data Yinfeng itself has provided, but

fails to show how relying on data that consist solely of rates from the

"busiest container ports in the world" (*i.e.*, Los Angeles and

Newark/New York to Shanghai) and "major commercial routes"

provides an ocean freight benchmark more reflective of "prevailing

market conditions" than a benchmark inclusive of other commercially

available routes from shipping sources.  Particularly where the record

does not support that only the busiest container ports and major

commercial routes are used.

Accordingly, Commerce's use of petitioner's Descartes data for an

average ocean freight price should be sustained because such data is

consistent with the statutory and regulatory benchmark requirements
and supported by substantial evidence.

B.   Commerce's Reliance On Land Benchmark Data Is
     Supported By Substantial Evidence And Otherwise Lawful

For the land benchmark, Commerce reasonably relied on a third-
tier benchmark—the 2010 land prices from Thailand adjusted for
inflation—to value land-use in China consistent with past
countervailing duty investigations.  IDM at 57-59.  Yinfeng argues that
its contemporaneous world land price data provide better sources for
the benchmark.  Yinfeng Br. at 35.  Yinfeng's arguments fail to address
Commerce's thorough analysis of factors beyond contemporaneity and
thus must fail.

As an initial matter, substantial record evidence supports
Commerce's resort to a third-tier benchmark for land-use.  As discussed
above, Commerce resorts to a third-tier benchmark to value inputs
when Commerce has first determined that tier-one and tier two
benchmark data is inappropriate for comparison or unavailable.  *See* 19
C.F.R. § 351.511(a).  For this investigation, Commerce determined it
could not use tier-one, domestic Chinese land price benchmark data, to
value land-use rights because Chinese land prices are distorted by the

government of China's role in the market.  IDM at 57; PDM at 31-32.

For the tier-two benchmark, Commerce examined facts on the record

regarding the nature and scope of the market for land to determine

whether a tier-two world market price would be available to purchasers

in China.  *See* IDM at 58; *see also* Land Analysis Memorandum, at

Attachment I, page 28 (Dep't of Commerce June 8, 2020); (P.R. 325).

Commerce concluded that such world market prices would not be

available to purchasers in China because land is "generally not

simultaneously 'available to an in-country purchaser' while located and

sold out-of-country on the world market."  *See* IDM at 58 (quoting Land

Analysis Memorandum at Attachment I, page 27 (concluding that

"Commerce finds that land, as an *in-situ* property, does not normally

lend itself to be considered under {tier-two.}"); *see also* PDM at 32.

Accordingly, Commerce reasonably resorted to an external, third-tier

benchmark to calculate a benefit for the provision of land at less than

adequate remuneration.  IDM at 57; PDM at 32.

    Consistent with past and recent countervailing duty

investigations, Commerce relied on 2010 prices for land in Thailand

from the CBRE's "Asian Marketview Reports" as the third-tier land

benchmark after considering national income levels, population density, and producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production.  *See* IDM at 57-58 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 63,788 (Dep't of Commerce October 17, 2012), and accompanying IDM at 6 and Comment 11 (including a complete history of Commerce's reliance on the CBRE benchmark data and concluding that it remained a valid land benchmark); and *Countervailing Duty Investigation of Certain Iron Mechanical Transfer Drive Components from the China: Final Affirmative Determination*, 81 Fed. Reg. 75,037 (Dep't of Commerce October 28, 2016); *see also* PDM at 32 (citing *Solar Cells Final Determination; Certain Hardwood Plywood Products from China: Final Affirmative Determination*, 82 Fed. Reg. 53,473 (Dep't of Commerce November 16, 2017); Land Analysis Memorandum at Attachment I, page 31 ("Although Commerce will examine the appropriate benchmark prices on a case-by-case basis, we intend to apply a similar analysis as in {*Laminated Woven Sacks from China*} in future China

{countervailing duty} proceedings."); and *Certain Steel Racks from China: Preliminary Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 62,297 (Dep't of Commerce December 3, 2018), and accompanying PDM at 35-36); Yinfeng Br. at 34-35.  Commerce also used an inflation index to extrapolate the 2010 land price data from Thailand to apply it to the period of investigation.  IDM at 59.

Yinfeng's argument that its contemporaneous data are more suitable land-use benchmarks is unavailing.  Yinfeng Br. at 35-36. Yinfeng submitted on the record two alternative benchmarks for land prices:  the CBRE's May 2016 Global Prime Logistics Rent Report and 2014-2019 Malaysia Investment Development Authority (MIDA) data for the cost of purchasing industrial land in Malaysia.  IDM at 58.  As explained above, Commerce resorted to a third-tier benchmark after concluding that world market land prices would not be available to purchasers of Chinese land in China and that Chinese land-use rights are not in accordance with market principles.  *Id*.  Thus, Commerce reasonably declined to use Yinfeng's world market land price data as a tier-two benchmark regardless of contemporaneity.

For external, third-tier land data, Commerce considered a number of factors including national income levels, population density, and producers' perceptions of reasonable alternatives to China for Asian production.  PDM at 15.   Commerce relied on two important factors to determine whether a country's land prices were suitable external benchmarks:  (1) the country's geographic proximity to China; and (2) the level of economic development comparable to China.  *See* IDM at 58; *see also* Land Analysis Memorandum at Attachment I, page 30.  As Commerce explained in its Land Benchmark Analysis Memorandum, its consideration of geographic proximity to China reflected "the fact that many countries near China compete as production and export platforms for foreign direct investment, and land cost is one important factor investors consider."  Land Analysis Memorandum at Attachment I, page 30.  However, Yinfeng's contemporaneous world land prices were unrelated to a country's proximity to China and the country's level of economic development comparable to China.  IDM at 59.  In the *Final Determination*, Commerce explained that "Yinfeng's proposed land benchmark contains world market prices from locations such as, *e.g.*, Munich, Germany, Sydney, Australia, and Stockholm, Sweden."  *Id.*

Commerce, however, found that such locations would not be "reasonable

alternatives to China as locations for Asian production," and that

Yinfeng's submission fails to include data that would allow Commerce

"to evaluate these locations' economic comparability with respect to

China." *Id.*

To the extent that Yinfeng challenges Commerce's reliance on the

Thai price data because the land prices are from 2010, *see* Yinfeng Br.

at 35-36, Commerce specifically adjusted the data using an inflation

index to extrapolate from 2010 to the period of investigation.  IDM at

59.  Although Yinfeng argues that its benchmark values are more

suitable because they "are contemporaneous with the PO{I} and provide

prices from a larger, more representative period of time," Yinfeng Br. at

35-36, contemporaneity and broader temporal representativeness both

fail to demonstrate that the land values represent those in a setting

comparable or proximate to China.  IDM at 59.  Accordingly, Commerce

was unpersuaded by Yinfeng's claim that its data are more suitable

based on contemporaneity.

Yinfeng also argues that Commerce should have selected its

proposed benchmarking data because Thailand is "no longer considered

economically comparable to China." Yinfeng Br. at 36. Specifically,

Yinfeng argues that Malaysia, Mexico and Brazil are economically

comparable to China, and thus Commerce should rely on Yinfeng's land

data submissions. However, Yinfeng bases its assessment of economic

comparability on Commerce's primary surrogate country selection

framework applied in antidumping proceedings, which are not

comparable here. *Id.*

    Rather, this case involves challenges to a countervailing duty

investigation not governed by Commerce's antidumping non-market

economy surrogate country selection framework. In antidumping non-

market economy cases, Commerce issues a list of potential surrogate

countries within a particular GNI range identified by Commerce to

establish economic comparability for the purposes of conducting the

antidumping proceeding. *See Antidumping Methodologies in*

*Proceedings Involving Non-Market Economy Countries: Surrogate*

*Country Selection and Separate Rates*, 72 Fed. Reg. 13,246 (Dep't of

Commerce Mar. 21, 2007). This process, however, "is not analogous to

tier-three benchmark selection in countervailing duty cases." IDM at

59. Nor does Yinfeng cite to any authority supporting its argument that

Commerce must rely on this framework to analyze economic comparability in selecting an external benchmark for land-use in a countervailing duty proceeding.

Further, Commerce explained the analysis it applies to select the third-tier land benchmark in a record memorandum.  *See* Land Analysis Memorandum at Attachment I, pages 30-31 and page 31.  In that memorandum, Commerce stated that although it "will examine the appropriate benchmark prices on a case-by-case basis," its analysis would be similar to the analysis in *Laminated Woven Sacks from China* in future China countervailing duty proceedings.  *Id.*  In *Laminated Woven Sacks from China*, Commerce compared the price respondent paid for land-use rights in China comparable to commercial land values of land sold in industrial estates, parks and zones in Thailand.  Land Analysis Memorandum at Attachment I, page 30.  At the time, China and Thailand were at comparable levels of economic development, and similar levels of per capita income at the provincial level or rough equivalent.  *Id.*  Further, population density in both places was comparable, with 141 persons per square kilometer ($k^2$) in China and $127/k^2$ in Thailand, and population density in the respective regions

both exceeded each country's national averages.  *Id.*  Additionally,

"Thailand and China competed as production and export platforms for

foreign direct investment."  *Id.*  Thus, Commerce determined that "the

'indicative land values' for land in Thai industrial zones, estate and

parks outlined in the Asian Industrial Property Reports constituted a

reasonable and comparable price against which the government price

for land in industrial zones in the Chinese province in question {could}

be benchmarked."  *Id.* (citing *Laminated Woven Sacks from China:*

*Preliminary Affirmative Countervailing Duty Determination*, 72 Fed.

Reg. 67,893 (Dep't of Commerce December 3, 2007), and *Issues and*

*Decision Memorandum for the Final Affirmative Countervailing Duty*

*Determination: Laminated Woven Sacks from China* (Dep't of Commerce

June 16, 2008)); *see also* IDM at 59.

Commerce further stated that "in making benchmark choices in a

country that satisfies the economic comparability requirement, it may

be appropriate to the extent the data permit to consider the *per capita*

income (GNI) and population density of the region or area in which the

land in China is located to that of different regions or areas in

benchmark candidate countries."  *Id.*  Thus, analysis of factors beyond

GNI are crucial to Commerce's selection of external, third-tier land benchmark data.  IDM at 59; Land Analysis Memorandum at Attachment I, page 30.  Commerce thoroughly analyzed these crucial factors, including population density and producers' perception of reasonable alternative production sites, in selecting Thailand as a third-tier benchmark country.

Accordingly, Commerce reasonably refrained from relying on Yinfeng's benchmark data because the record contained no analysis of crucial comparability factors other than GNI.  *See* IDM at 59.  Thus, Commerce had no reason to depart from its chosen Thai data and its reliance on such data as a third-tier land benchmark is supported by substantial evidence and lawful.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion for judgment upon the agency record and sustain Commerce's final determination in the countervailing duty investigation of millwork products from China.

Respectfully submitted,

BRIAN M. BOYNTON
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:


/s/ Ioana Cristei
IOANA CRISTEI
LESLIE LEWIS                          Trial Attorney
Attorney                              Civil Division/National Courts
Office of the Chief Counsel           U.S. Department of Justice
    for Trade Enforcement &           P.O. Box 480
Compliance                            Washington, DC 20044
U.S. Department of Commerce           (202) 305-0001
                                      Fax: (202) 305-7644
                                      Email: ioana.cristei@usdoj.gov


December 9, 2021                      Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 12,979 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word). This brief was written using the typeface Century Schoolbook in size 14 font.

<u>/s/ Ioana Cristei</u>

December 9, 2021