NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

FUJIAN YINFENG IMP &EXP
TRADING CO., LTD.,

      Plaintiff,

v.

UNITED STATES,

      Defendant,

and

COALITION OF AMERICAN
MILLWORK PRODUCERS,

      Defendant-Intervenor.

Before: Hon. M. Miller Baker,
Judge

Ct. No. 21-00088

NON-CONFIDENTIAL
VERSION

Business Proprietary
Information Removed from
Pages 6 and 7

## COALITION OF AMERICAN MILLWORK PRODUCERS' RESPONSE BRIEF

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of
American Millwork Producers*

Dated: December 22, 2021

Ct. No. 21-00088                                          NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................... 1

II.   RULE 56.2 STATEMENT .................................................................... 1

    A.   Administrative Decision Under Review ................................. 1

    B.   Issues Presented ...................................................................... 2

III.  STATEMENT OF FACTS ..................................................................... 5

    A.   The Primer for Less Than Adequate Remuneration Subsidy Program .......................................... 5

    B.   The Export Buyer's Credit Program ...................................... 9

    C.   The Ocean Freight Benchmark ............................................ 14

    D.   The Land Benchmark ............................................................ 16

IV.   ARGUMENT ......................................................................................... 17

    A.   Commerce's Reasonably Countervailed Yinfeng's Purchases of Acrylic Polymer Under the Provision of Primer, Including Gesso, for LTAR Program .................. 17

    B.   Commerce's Decision to Apply Facts Available with an Adverse Inference and Countervail the Export Buyer's Credit Program Was Supported by Substantial Evidence and Otherwise in Accordance with Law ............................................................. 23

    C.   Commerce Did Not Err in Calculating the Ocean Freight Benchmark for the Provision of Plywood and Sawnwood for LTAR Subsidy Programs ...................... 32

    D.   Commerce Did Not Err in Calculating the Benchmark for the Provision of Land-Use Rights for LTAR Subsidy Program ................................................... 35

V.    CONCLUSION ...................................................................................... 38

NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
195 F.Supp.3d 1334 (Ct. Int'l Trade 2016) .........................................31

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) .................................................................. 18, 32

*Guizhou Tyre Co. v. United States*,
348 F.Supp.3d 1261 (Ct. Int'l Trade 2018) .........................................31

*INS v. Elias-Zacarias*,
502 U.S. 478 (1992) ...........................................................................31

*Matsushita Elec. Indus. Co. v United States*,
750 F.2d 927 (Fed. Cir. 1984) ............................................................37

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ..........................................................27

*RZBC Grp. Shareholding Co. v. United States*,
222 F.Supp.3d 1196 (Ct. Int'l Trade 2017) .........................................31

*Shandong TTCA Biochemistry Co. v. United States*,
35 CIT 545, 774 F.Supp.2d 1317 (2011) .............................................32

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
28 CIT 1635, 353 F.Supp.2d 1294 (2004) ...........................................30

## Statutes

19 U.S.C. § 1677e ...............................................................................3

19 U.S.C. § 1677e(a) ........................................................................25

19 U.S.C. § 1677e(a)(2) ....................................................................25

NON-CONFIDENTIAL VERSION

## Regulations

19 C.F.R. § 351.311(b) ............................................................... 22

19 C.F.R. § 351.511(a)(2)(ii) ..................................................... 14

19 C.F.R. § 351.511(a)(2)(iii) ................................................... 16

# GLOSSARY

**CAMP**

Coalition of American Millwork Producers

**CBRE**

CB Richard Ellis

**China Ex-Im Bank**

Export-Import Bank of China

**Commerce**

U.S. Department of Commerce

**CAFC**

Court of Appeals for the Federal Circuit

**GOC**

Government of China

**LTAR**

Less than adequate remuneration

**Mangrove**

Fujian Province Youxi City Mangrove Wood Machining Co., Ltd

**MIDA**

Malaysia Investment Development Authority

**Petitioner**

Coalition of American Millwork Producers

**Plaintiff**

Fujian Yinfeng Imp & Exp Trading Co., Ltd.

**WMMP**

Wood mouldings and millwork products

Ct. No. 21-00088                                    NON-CONFIDENTIAL VERSION

**WTO**

World Trade Organization

**Yuanqiao**

Fujian Nanping Yuanqiao Wood-Industry Co., Ltd.

**Yinfeng**

Fujian Yinfeng Imp & Exp Trading Co., Ltd.

## I.   INTRODUCTION

On behalf of the Coalition of American Millwork Producers ("CAMP" or "Petitioner"), we respectfully submit this response to the August 17, 2021 opening brief by Fujian Yinfeng Imp & Exp Trading Co., Ltd. ("Yinfeng" or "Plaintiff"). *See* Pl.'s Rule 56.2 Mem. in Supp. of Mot. for J. Upon the Agency R. (Aug. 7, 2021), ECF No. 22 ("Yinfeng Br."). Petitioner concurs with and adopts by reference the arguments in the December 9, 2021 response brief of Defendant United States. *See* Def.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Dec. 9, 2021), ECF No. 25 ("Def. Br.").

## II.   RULE 56.2 STATEMENT

### A.   Administrative Decision Under Review

The administrative determination challenged by Yinfeng is the U.S. Department of Commerce's ("Commerce") final determination in the countervailing duty ("CVD") investigation of wood mouldings and millwork products ("WMMP") from China. *See Wood Mouldings and Millwork Products from the People's Republic of China*, 86 Fed. Reg. 67 (Dep't Commerce Jan. 4, 2021), Appx001394-Appx001397 ("Final

NON-CONFIDENTIAL VERSION

Determination"); Issues and Decision Memorandum accompanying Final

Determination, Appx001000-Appx001071 ("IDM").

### B.  <u>Issues Presented</u>

    1.    **Whether Commerce reasonably countervailed Yinfeng's purchases of acrylic polymer under the Provision of Primer, Including Gesso, for Less Than Adequate Remuneration subsidy program?**

Yes. While Yinfeng failed to provide any details regarding the exact

type of acrylic polymer purchased during the period of investigation

("POI"), Petitioner submitted substantial evidence indicating that acrylic

polymer can, on its own, be used as a primer. Commerce reasonably relied

on this evidence to countervail Yinfeng's purchases under the Provision

of Primer, Including Gesso, for Less Than Adequate Remuneration

("LTAR") program. In addition, Yinfeng is incorrect that Commerce's

inclusion of acrylic polymer in this subsidy program runs counter to

agency practice, and its World Trade Organization ("WTO") arguments

are misplaced.

     **2.**    **Whether Commerce's determination to apply facts available with adverse inferences and countervail the Export Buyer's Credit Program was supported by substantial evidence and otherwise in accordance with law?**

Yes. As it has done repeatedly in prior investigations, the Government of China ("GOC") failed to cooperate to the best of its ability with Commerce's investigation of the Export Buyer's Credit Program subsidy. The information that the GOC refused to provide to Commerce was critical to the agency's thorough understanding of the program and, in particular, critical to effectively verify Yinfeng's claims of non-use of the program. As a result of the GOC's failure to cooperate to the best of its ability, necessary information was not available on the record, and the GOC withheld information requested by Commerce, significantly impeded the proceeding and provided information that could not be verified. Thus, the application of facts available with an adverse inference ("AFA") was justified. *See* 19 U.S.C. § 1677e. In its final determination, Commerce comprehensively explained its rationale, including the importance of the information missing from the record, and the Court should uphold the agency's reasoned determination to countervail this subsidy program.

3.    Whether Commerce appropriately calculated the ocean freight benchmark for the Provision of Plywood and Sawnwood for Less Than Adequate Remuneration subsidy programs?

Yes. Commerce appropriately relied on Petitioner's data from Descartes in measuring the value of ocean freight for the Provision of Plywood and Sawnwood for LTAR programs. Yinfeng's primary argument, that CAMP's data reflected rates for specialized, higher-cost shipping containers, is incorrect, and Yinfeng failed to show that certain surcharges included in the CAMP data were atypical. Finally, contrary to Yinfeng's argument, the rates provided by CAMP were for a commercially available shipping route and consistent with prevailing market conditions.

4.    Whether Commerce appropriately selected a benchmark for the Provision of Land-Use Rights for Less Than Adequate Remuneration subsidy program?

Yes. Yinfeng's claims that Commerce was required to rely upon the benchmark data that the respondent submitted for the record, rather than the Thailand benchmark data that the agency consistently relies upon in CVD proceedings, are unfounded. Yinfeng mistakenly focuses exclusively on the data sources' contemporaneity, rather than the other factors comprehensively analyzed by the agency, and cites to

unpersuasive antidumping duty cases to support its argument in this CVD case.

## III.   STATEMENT OF FACTS

On January 28, 2020, Commerce initiated a CVD investigation into WMMP from China. *Wood Mouldings and Millwork Products from China*, 85 Fed. Reg. 6,513, 6,516 (Dep't Commerce Feb. 5, 2020), Appx013402. Commerce selected Yinfeng and Fujian Nanping Yuanqiao Wood-Industry Co., Ltd. ("Yuanqiao") as the mandatory respondents, calculated preliminary subsidy margins of 245.34% for Yuanqiao and 13.61% for Yinfeng and all others, and calculated final subsidy margins of 252.29% for Yuanqiao and 20.56% for Yinfeng and all others. *Wood Mouldings and Millwork Products From the People's Republic of China*, 85 Fed. Reg. 35,900, 34,901 (Dep't Commerce June 12, 2020), Appx001606; Final Determination at 68, Appx001395.

### A.   The Primer for Less Than Adequate Remuneration Subsidy Program

CAMP filed two new subsidy allegations in the underlying investigation, including an allegation that Chinese WMMP producers benefited from the provision of primer, including gesso, for LTAR. Letter from Wiley Rein LLP to Sec'y Commerce, re: *New Subsidy Allegations*

Business Proprietary Information
Has Been Deleted

(May 6, 2020) at 1, Appx014743 ("CAMP NSAs"). In the allegation, CAMP noted that "{b}oth gesso and other primers are often applied to {WMMP}, and they may be used by the mandatory respondent in this investigation to coat and finish its subject merchandise." *Id.* at 2, Appx014744. CAMP characterized the providers of primer as members of China's "chemicals industry." *Id.* at 3, 9, Appx014744, Appx014751. Commerce initiated an investigation of the subsidy program. Memorandum from Irene Gorelik & Faris Montgomery to Irene Darzenta Tzafolias, re: *Decision Memorandum on New Subsidy Allegations and Creditworthiness Allegation* (June 4, 2020) at 4-6, Appx012170-Appx012172.

Commerce issued Yinfeng a new subsidy allegations questionnaire, and Yinfeng reported that its affiliate Fujian Province Youxi City Mangrove Wood Machining Co., Ltd. ("Mangrove") purchased [

] during the POI, rather than gesso, and thus stated that this subsidy program was "not applicable." Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Yinfeng's New Subsidy Allegations Questionnaire, Creditworthiness Questionnaire, and the Fourth Supplemental Questionnaire* (June 25, 2020) at 1-2, Appx012206-

Appx012207. Commerce issued Yinfeng a supplemental new subsidy allegations questionnaire, requesting that it report its purchases of [                    ] during the POI. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Supplemental New Subsidy Allegations* (Aug. 17, 2020) at 1-2, Appx012560-012561. Yinfeng reported these purchases but argued that they should not be covered by the subsidy program being investigated. *Id.* at 1-2 and Exhibit SQ5-1, Appx012560-012561, 012565-012577.

Commerce then issued a request to parties to submit factual information regarding whether acrylic polymer can be utilized as a primer without further processing or is considered to be a primer by industry standards, and both CAMP and Yinfeng submitted factual information in response. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Submission of Factual Information Regarding Acrylic Polymer* (Sept. 24, 2020), Appx013095-Appx013150 ("CAMP NSA NFI Submission"). Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *NSA Factual Information* (Sept. 25, 2020), Appx012938-Appx013094 ("Yinfeng NSA NFI Submission").

In a post-preliminary analysis memorandum, Commerce found that "{r}ecord evidence indicates that acrylic polymers can be used as primer without further processing," and it countervailed Yinfeng's purchases of acrylic polymer under the primer-for-LTAR subsidy program. Memorandum from James Maeder to Jeffrey I. Kessler, re: *Post-Preliminary Analysis of the Countervailing Duty Investigation of Wood Mouldings and Millwork Products from the People's Republic of China* (Oct. 19, 2020) at 13, Appx001620. Yinfeng contested this decision in its case brief, and CAMP responded in its rebuttal brief. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Yinfeng Case Brief* (Oct. 30, 2020) at 2-8, Appx028547-Appx028553 ("Yinfeng Case Brief"); Letter from Wiley Rein LLP to Sec'y Commerce, re: *Rebuttal Brief* (Nov. 6, 2020) at 4-11, Appx013268-Appx013275 ("CAMP Rebuttal Brief"). In the final determination, Commerce continued to find that Yinfeng's acrylic polymer purchases should be included in the primer-for-LTAR subsidy program, and it calculated a subsidy rate of 3.07% for Yinfeng under this program. IDM at 7, 50-53, Appx001006, Appx001049-Appx001052.

### B.   The Export Buyer's Credit Program

In its initial questionnaire to the GOC, Commerce made several requests related to the Export Buyer's Credit Program. For example, Commerce requested that the GOC provide "a list of all partner/correspondent banks involved in the disbursement of funds under the Export Buyer's Credit Program." Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *GOC Section II Questionnaire Response* (Apr. 13, 2020) at 61, Appx005962 ("GOC IQR"). The GOC did not provide the requested list stating: "{b}ased on information available to the GOC at this stage, the GOC confirms that it collected U.S. customer lists from the respondents and that none of the U.S. customers of the respondents used the alleged program during the POI. Therefore, this question is not applicable." *Id.*

Commerce also requested that the GOC submit its supplemental questionnaire response from a prior CVD investigation, which the GOC submitted. *Id.* at 60 and Exhibit EXPORT-1, Appx005961, Appx010406-Appx010417. Commerce requested that the GOC "{p}rovide original and translated copies of any laws, regulations or other governing documents cited by the GOC in {that} Export Buyer's Credit Supplemental

Questionnaire Response." *Id.* at 61, Appx005962. That relevant supplemental questionnaire response referred to "internal guidelines" adopted in 2013 by the Export-Import Bank of China ("China Ex-Im Bank"), and Commerce specifically asked for the GOC to submit the 2013 revisions in that supplemental questionnaire. *Id.* at Exhibit EXPORT-1, p. 3, Appx010414. However, in the prior response and in its questionnaire response in this investigation, the GOC did not submit the requested 2013 revisions to the Export Buyer's Credit Program, submitting only Administrative Measures from 2000 and Implementing Rules from 1995. *Id.* at 61, Exhibits EXPORT-2, EXPORT-3, Appx005962, Appx010418-Appx010429. The GOC responded to several other agency requests regarding the Export Buyer's Credit Program by stating that the question was "not applicable." *See id.* at 60, Appx005961.

Yinfeng also submitted a questionnaire response regarding the Export Buyer's Credit Program. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Yinfeng Section III Questionnaire Response* (Apr. 13, 2020) at 22-24, Appx005359-Appx005361. Yinfeng stated that it understood none of its customers applied for or received funding under the Export Buyer's Credit Program, and it provided certifications to this

effect from its customers during the POI. *Id.* at 23-24, Exhibits 10, 12, Appx005360-Appx005361,     Appx005517-Appx005518,     Appx005528-Appx005541. Yinfeng also provided only the 2000 Administrative Measures as the "regulation concerning the export buyer's credit program." *Id.* at 24, Exhibit 11, Appx005361, Appx005519-Appx005527.

Commerce then issued a supplemental questionnaire to the GOC, including several questions related to the Export Buyer's Credit Program. *See* Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *GOC First Supplemental Questionnaire Response* (May 15, 2020) at 3-7, Appx011276-Appx0011280 ("GOC 1st SQR"). Commerce specifically asked for the GOC to submit the Administrative Measures that were <u>revised in 2013</u>. *Id.* at 5, Appx011278. The GOC responded that it had already provided the Rules Governing Export Buyers' Credit of the Export-Import Bank of China, pointing to the Administrative Measures from 2000 attached to its initial questionnaire response, and it did not provide the requested 2013 revision. *Id.* at 5-6, Appx011278-Appx011279; GOC IQR at Exhibit EXPORT-2, Appx010418-Appx010424. In addition, Commerce again asked for "a list of all partner/correspondent banks involved in disbursement of funds under the Export Buyer's Credit

program." GOC 1st SQR at 6, Appx011279. The GOC responded that it "understands that this question is not applicable" and that it was "unable to compel the Ex-Im Bank to disclose, or provide the GOC with, a list of all partner or correspondent banks which may have been involved in disbursement of funds under the Export Buyer's Credit Program." *Id.* Thus, the GOC did not provide the requested list of banks. The GOC declined to answer several additional questions related to the Program, stating that the information "relates to the bank's business operation data" and could not be provided, or that Commerce should refer to the company mandatory respondents' questionnaire responses for the requested information. *See id.* at 6-7, Appx011279-011280.

In the preliminary determination, Commerce determined that the use of AFA was warranted in finding the Export Buyer's Credit Program to be countervailable, "because the GOC did not provide the requested information needed to allow Commerce to fully analyze this program." Preliminary Decision Memorandum accompanying *Wood Mouldings and Millwork Products from the People's Republic of China*, 85 Fed. Reg. 35,900 (Dep't Commerce June 12, 2020) 14-17, Appx001414-Appx001417.

NON-CONFIDENTIAL VERSION

Commerce applied a rate of 10.54% for the Export Buyer's Credit Program to Yinfeng's preliminary subsidy margin. *Id.* at 17, Appx001417.

In its case brief, Yinfeng argued that Commerce should reverse its preliminary finding on the Export Buyer's Credit Program and find in the final determination that Yinfeng did not use or benefit from the program. Yinfeng Case Brief at 20-25, Appx028565-Appx028570. In part, Yinfeng claimed that Commerce had "failed to explain the need for thoroughly understanding every single detail of {the} program's operations," nor did Commerce "illustrate beyond a conclusory sentence as to why such understanding is necessary for verification." *Id.* at 24, Appx028569. The GOC also submitted a case brief, making similar arguments. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *GOC Case Brief* (Oct. 30, 2020) at 2-7, Appx028473-Appx028478.

CAMP responded in its rebuttal brief, arguing that Commerce should continue to apply AFA and countervail the Export Buyer's Credit Program in the final determination. CAMP Rebuttal Brief at 11-23, Appx013275-Appx013287. CAMP noted that the record lacked critical information regarding the Program, and that the GOC and Yinfeng had not contested that the GOC failed to provide information the agency had

repeatedly found to be necessary to determine non-use of this subsidy program. *Id.* at 12, Appx013276. In particular, CAMP argued, the GOC had failed to provide requested information concerning 2013 revisions to the subsidy program and the list of partner/correspondent banks involved in the disbursement of funds through the program. *Id.* at 17, Appx013281. CAMP further noted that, unlike in some prior cases in which the agency's findings on this issue were remanded on appeal, in this investigation, Commerce had thoroughly explained its rationale for applying AFA. *Id.* at 20, Appx013284.

In the final determination, Commerce continued to apply AFA and countervail the Export Buyer's Credit Program. IDM at 9-31, Appx001008-Appx001030. In part as a result of this finding. Commerce calculated a final subsidy margin of 10.54% for Yinfeng for this program. *See* Final Determination at 68, Appx001395.

## C.   The Ocean Freight Benchmark

In the underlying investigation, Commerce applied a tier-two benchmark under 19 C.F.R. § 351.511(a)(2)(ii) to calculate the cost of ocean freight for respondents' plywood and sawnwood inputs. *See* IDM at 62, Appx001061. Both CAMP and Yinfeng submitted proposed

benchmark data to measure ocean freight costs: Yinfeng submitted data
from Maersk and Descartes, and Petitioner submitted data from
Descartes. Letter from Wiley Rein LLP to Sec'y Commerce, re:
*Benchmark Pricing Information* (May 11, 2020) at 3, Exhibits 6, 8,
Appx015277, Appx015345-Appx015357, Appx015368-Appx015370
("CAMP Benchmark Submission"); Letter from deKieffer & Horgan to
Sec'y Commerce, re: *Yinfeng Benchmark Submission* (May 11, 2020) at 1
and Exhibits 4-7, Appx014911, Appx014943-Appx015085 ("Yinfeng
Benchmark Submission").

Yinfeng argued that Petitioner's ocean freight data should be excluded
from the benchmark calculation, and CAMP responded in rebuttal. *See*
Yinfeng Case Brief at 8-11, Appx028553-Appx028556; CAMP Rebuttal
Brief at 27-33, Appx013291-Appx013297. In the final determination,
Commerce relied on an average of all three datasets to calculate the ocean
freight benchmark for the provision of plywood and sawnwood for LTAR
subsidy programs. *See* IDM at Comment 11, Appx001059-Appx001064.
In part as a result of that determination, Commerce calculated a final
subsidy rate of 0.29% for Yinfeng for the provision of plywood for LTAR

NON-CONFIDENTIAL VERSION

and 3.26% for Yinfeng for the provision of sawnwood for LTAR. *Id.* at 6, Appx001005.

### D.   The Land Benchmark

In the underlying investigation, Commerce applied a tier-three benchmark under 19 C.F.R. § 351.511(a)(2)(iii) to calculate the cost of land in China for purposes of the land-use rights for LTAR subsidy program. *Id.* at 57-58, Appx001056-Appx001057. Commerce placed onto the record 2010 prices for land in Thailand from the CB Richard Ellis ("CBRE") Asian Marketview Reports for use as the benchmark, adjusted for inflation. *Id.* Yinfeng also submitted as potential land benchmark sources CBRE's Global Prime Logistics Rent Report from May 2016 and data for the cost of purchasing industrial land in Malaysia from 2014-2019 from the Malaysia Investment Development Authority ("MIDA"). Yinfeng Benchmark Submission at Exhibits 9, 10, Appx015087-Appx015195.

In its case brief, Yinfeng argued that Commerce should rely on Yinfeng's benchmark data for the provision of land for LTAR program, and CAMP rebutted Yinfeng's argument. Yinfeng Case Brief at 15-16, Appx028560-Appx028561; CAMP Rebuttal Brief at 33-34, Appx013297-

Appx013298. In the final determination, Commerce rejected Yinfeng's argument and continued to rely on CBRE's Thailand data for the provision of land-use rights for LTAR benchmark. IDM at Comment 10, Appx001055-Appx001058.

## IV.   ARGUMENT

### A.   Commerce's Reasonably Countervailed Yinfeng's Purchases of Acrylic Polymer Under the Provision of Primer, Including Gesso, for LTAR Program

Commerce's determination that Yinfeng's purchases of acrylic polymers during the POI were purchases of primer and thus were properly included in the input purchases countervailed in the primer for LTAR program was supported by substantial evidence and otherwise lawful.

Yinfeng alleges that Commerce's determination that "acrylic polymer, as a stand-alone product, could be considered to be or used as a primer" was not supported by substantial evidence. Yinfeng Br. at 24 (citing IDM at 50, Appx001049). This is incorrect. Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial

evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). The evidence supporting Commerce's determination in the underlying proceeding clearly meets this standard. This substantial evidence includes the following:

- Excerpts from the Gellner Industrial website, a U.S. manufacturer of acrylic polymers, showing that acrylic polymer is used as a coating and primer for numerous industrial and household applications, including wood products. CAMP NSA NFI Submission at 2, Exhibit 1, Appx013096, Appx013118-Appx013128.

- Excerpts from a website dedicated to household painting that describes the use of acrylic primer on a variety of interior and exterior household wood surfaces, including wood trim, doors, windows, and paneling. *Id.* at 2, Exhibit 2, Appx013096, Appx013129-Appx013133.

- Excerpts from PaintPRO Magazine providing information for professional paint and decorating contractors that details the use of acrylic primer on interior woodwork, trim, and crown moulding. *Id.* at 2, Exhibit 3, Appx013096, Appx013134-Appx013136.

- Information providing the scientific definition and make-up of "acrylic polymer," noting that acrylic polymers are commonly known as "acrylics," and explaining that "{a}crylic polymers have been used in the coating industry for some time and have great usefulness because of their UV stability and wide range of use." *Id.* at 2, Exhibit 4, Appx013096, Appx013137-Appx013150.

Commerce cited this evidence in its post-preliminary and final determinations, explaining that "the petitioner provided industry definitions and products for sale that generally indicated that single-ingredient acrylic polymers, such as those Yinfeng affiliate Mangrove

purchased, were considered primers by industry standards and used as a coating for wood products." IDM at 50, Appx001049. Commerce further noted that, besides a certification with no supporting documentation, it "did not receive any evidence demonstrating that the product Mangrove purchased did not fall within the auspices of the primer input." *Id.* at 51, Appx001050. In fact, despite presumably having this information in its possession, Yinfeng never provided any details regarding the specific acrylic polymer that Mangrove purchased or the production processes used to apply acrylic polymer as primer. *See id.* ("{T}here is no information on the record regarding either the specifics of the product purchased or what processing would be required for a non-gesso primer."); CAMP Rebuttal Brief at 5-6, Appx013269-Appx013270 (Commerce "provided Yinfeng multiple opportunities to provide a complete description and supporting documentation of the actual input it purchased, which is information only available to Yinfeng . . . Yinfeng steadfastly failed to provide any specific information."). Rather, Yinfeng simply provided information on the Harmonized Tariff Schedule ("HTS") classification of acrylic polymer, which showed that it was not classified as paint but did not show that acrylic polymer itself could not be used as

a primer. *Id.* at 6, Appx013270. As such, the only reliable, supported evidence on the record showed that acrylic polymer could in fact be used as a primer.

Yinfeng now argues that "{e}ven the articles provided by petitioner describe acrylic polymers <u>for</u> coatings or <u>for</u> paints and primers," stating that the language indicates that acrylic polymer is an input in coatings and paints but not a paint or coating itself. Yinfeng Br. at 26 (emphasis in original). This is not true. For example, Exhibit 1 to CAMP's NSA NFI Submission states that acrylic polymers "provide a variety of quality coatings for a number of entities in the industrial world," "meet the high alkali resistance required for floor coating and wall coating applications," and "showcase a large variety of industrial applications including industrial coatings." CAMP NSA NFI Submission at Exhibit 1, Appx013118-Appx013128. The exhibit further states that "{t}here are a variety of different water-based acrylic polymers, including . . . water-based acrylic polymers for primers" and that a particular acrylic "polymer is perfectly suitable for furniture coatings," including on wood. *Id.* It also describes that acrylic polymer as "suitable for use as a coating on furniture." *Id.* The exhibit does <u>not</u> state that further processing is

NON-CONFIDENTIAL VERSION

required to transform the acrylic polymer into a different product before it can be used as a coating. Rather, it describes the applications for acrylic polymer, itself, as including coating.

Yinfeng further asserts that "{o}ther articles submitted by petitioner discuss acrylic paint primer, which is also not the same as using straight acrylic polymer." Yinfeng Br. at 26. But, just as in the underlying investigation, Yinfeng cites no evidence to support this. To the contrary, Petitioner submitted information showing that "{a}crylic polymers are commonly known as acrylics," CAMP NSA NFI Submission at Exhibit 4, Appx013137-Appx013150, which thus serves as evidence that references to "acrylic primer" also encompass acrylic polymer.

Yinfeng next argues that "acrylic polymer is classified under a different HTS" code than paints and plasters. Yinfeng Br. at 27. But this is not dispositive as to whether acrylic polymer can itself be used as a primer. In fact, as Commerce explained, the U.S. Customs and Border Protection rulings provided by Yinfeng demonstrate that products under the relevant HTS code for acrylic polymer include both inputs and finished products. IDM at 51, Appx001050; Yinfeng NSA NFI Submission at Exhibit 7, Appx013081-Appx013091. Notably, the HTS code includes

finished products such as resin solutions that could be used as sealants or coatings. Thus, Commerce reasonably concluded that "Yinfeng's reporting of its purchases under this HS subheading was not conclusive of the product's usability as a primer." IDM at 51, Appx001050.

Yinfeng argues that the "expansion" of the LTAR program was also contrary to agency practice, because Commerce "only investigates and confers a benefit for a program that was alleged." Yinfeng Br. at 28. Setting aside that this program <u>was</u> alleged, because acrylic polymer is a primer, Yinfeng is also wrong as a matter of law. The agency's regulations explicitly provide that Commerce has the authority to include a "subsidy practice discovered during investigation" in an ongoing case, even if that practice was not alleged by the petitioner, and that it "will" in fact do so, when "sufficient time remains." 19 C.F.R. § 351.311(b). Commerce appropriately concluded that CAMP did in fact allege this program. However, even if it had not, the agency had the authority to investigate and countervail Yinfeng's purchases of acrylic polymer for LTAR.

Finally, as set forth in Defendant's brief, Yinfeng's arguments regarding the WTO Agreement on Subsidies and Countervailing Measures are misplaced. *See* Yinfeng Br. at 28-29; Def. Br. at 53.

In sum, Commerce's determination to countervail Yinfeng's acrylic polymer purchases under the provision of primer, including gesso, for LTAR subsidy program was supported by substantial record evidence and otherwise lawful, and should be upheld by the Court.

### B. Commerce's Decision to Apply Facts Available with an Adverse Inference and Countervail the Export Buyer's Credit Program Was Supported by Substantial Evidence and Otherwise in Accordance with Law

In the underlying investigation, Commerce concluded, based on substantial evidence, that the GOC failed to cooperate to the best of its ability with the agency's investigation of the Export Buyer's Credit Program, with the result that critical information to verify Yinfeng's claims of non-use was missing from the record. Thus, Commerce reasonably applied AFA to fill the gaps in the record and countervailed the subsidy program. Yinfeng's arguments that the agency's determination to countervail the Export Buyer's Credit Program was unreasonable and unlawful should be rejected by the Court.

Commerce explained in extensive detail its application of AFA as to the use of this program in its final results. *See* IDM at 9-31, Appx001008-Appx001030. The agency described the history of its analysis on this issue, which informs its decision to continue to apply AFA when the GOC fails to

provide the requested information. *See id.* at 20-31, Appx001015-Appx001030. Specifically, Commerce explained the history behind its reasoning that the information requested regarding changes to the Export Buyer's Credit Program is necessary to evaluate respondents' use of the program. *See id.* at 24, Appx001023. Then, Commerce applied its analysis to the facts of the instant proceeding, continuing to find that based on the GOC's failure to provide requested information concerning revisions made to the Program and the partner/correspondent banks involved in the disbursement of funds, it was not possible for the agency to fully understand how the program operates and, thus, it could not determine the extent to which respondents used the program during the POI. *See id.* at 20-31, Appx001015-Appx001030.

In its brief, Yinfeng first explains that the Court of Appeals for the Federal Circuit ("CAFC") has set forth a two-part requirement for Commerce's application of AFA. Yinfeng Br. at 6. Yinfeng states: "First, the Department must identify why it needs to rely on facts otherwise available, and second, the Department must show how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference." *Id.* (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373,

1381 (Fed. Cir. 2003)). Thus, Yinfeng argues that Commerce "must first establish its authority to act under Section 1677e(a) {to apply facts otherwise available} before it can properly invoke Section 1677e(b) and apply AFA." Yinfeng Br. at 6-7. While Yinfeng implies that it failed to do so, Commerce satisfied both of those requirements for the application of AFA here.

First, consistent with Section 1677e(a), Commerce was required to rely on facts otherwise available because the GOC withheld information that was requested by Commerce and significantly impeded the proceeding. 19 U.S.C. § 1677e(a)(2). As Commerce found, "necessary information is not on the record because the GOC withheld information that we requested that was reasonably available to it, which significantly impeded the proceeding." IDM at 30, Appx001029. In fact, the agency went to great length in the final determination to explain the basis for its facts otherwise available finding. Among the requested information that the GOC withheld with regard to the Export Buyer's Credit Program were two particularly critical pieces of information:

- A list of partner/correspondent banks involved in the disbursement of funds under the Export Buyer's Credit Program;

- The Administrative Measures governing the Program that were revised in 2013.

*Id.* at 20, Appx001019. In fact, Commerce found that the GOC "was unresponsive to a majority of {its} requests." *Id.* Yinfeng does not dispute that the GOC failed to provide this requested information to Commerce. *See generally* Yinfeng Br.

Indeed, the GOC twice refused to provide the list of partner/correspondent banks involved in the disbursement of the relevant funds, deeming the agency's information request "not applicable." GOC IQR at 61, Appx005962; GOC 1st SQR at 6, Appx011279. *See also* IDM at 23. The GOC also twice refused to provide the 2013 revisions to the guidelines regarding the operation of the Export Buyer's Credit Program, dodging Commerce's questions and providing only outdated regulations. GOC IQR at 61-63, Exhibits EXPORT-2, EXPORT-3, Appx005962-Appx005964, Appx010418-Appx010429; GOC 1st SQR at 5-6, Appx011278-Appx011279. *See also* IDM at 21-22, Appx001020-Appx001021. The GOC thus withheld requested information, under the plain meaning of the statute. No other party submitted either of these two pieces of information and, as a result, the information was not available on the record.

Second, Commerce "show{ed} how {the GOC} failed to cooperate to the best of its ability as to warrant the use of an adverse inference when selecting from the facts otherwise available." Yinfeng Br. at 6 (internal citation omitted). As the CAFC has explained, cooperating to the best of an interested party's ability requires that party to exert "<u>maximum effort</u> to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382 (emphasis added). No reasonable reading of the GOC's questionnaire responses could possibly show "maximum effort" by the GOC to comply here.

For the list of partner/correspondent banks, the GOC overtly refused to respond to the request, twice attempting to supplant its own judgment for that of the agency's that the question was "not applicable." GOC IQR at 61; GOC 1st SQR at 6. As Commerce noted, "it is for Commerce, not the GOC, to determine whether the information provided is sufficient for Commerce to make its determinations." IDM at 23, Appx001022.

With regard to the 2013 revisions to the Export Buyer's Credit Program guidelines, the GOC simply ignored the agency's request – twice. GOC IQR at 61-63, Exhibits EXPORT-2, EXPORT-3, Appx005962-Appx05964, Appx010418-Appx010429; GOC 1st SQR at 5-6,

27

Appx011278-Appx011279. As Commerce explained, "{t}he GOC did not even acknowledge the request for the 2013 revised Administrative Measures in response to our direct request." IDM at 22, Appx001021. As a result of these outright refusals by the GOC to provide requested information, Commerce reasonably found that the GOC did not act to the best of its ability in providing the necessary information to the agency. *Id.* at 30, Appx001029. As such, Commerce in the final determination closely adhered to the framework Yinfeng asserts is required for the application of AFA.

Yinfeng next argues that the agency's determination was in error because the information missing from the record – namely the 2013 revised Program guidelines and the list of third-party banks involved in disbursing funds – was not information "necessary" for Commerce to verify non-use. *See* Yinfeng Br. at 10-14. Yinfeng characterizes Commerce's explanation that it lacked a complete and reliable understanding of the program due to the missing information as nothing but a "vague claim." *Id.* at 14. But Commerce's 16-page explanation of its findings related to the Export Buyer's Credit Program in the final determination does not constitute a "vague claim." *See* IDM at 15-31, Appx001014-Appx001030.

NON-CONFIDENTIAL VERSION

Rather, in careful detail, the agency walked through exactly why the information related to the 2013 revisions and the third-party disbursing banks was essential to establish any claim of non-use of the subsidy program.

As part of this detailed explanation, Commerce noted that the missing information was especially significant because record evidence indicates that funds under the Export Buyer's Credit Program can be disbursed by third-party banks, not just the China Ex-Im Bank directly. *Id.* at 24, Appx001023. The GOC refused to provide the identities of those banks to Commerce. *Id.* Yet, during any verification of the program with Yinfeng's customers, "it would be {the third-party banks'} names, not the name 'China Ex-Im Bank,' that would appear in the subledgers of the U.S. customers if they received the credits." *Id.* Put simply, if Commerce does not know who those banks are, it would not know which bank name to look for in a customer's books and records. Thus, "having a list of the correspondent banks is critical for {Commerce} to perform verification at the U.S. customers." *Id.* at 25, Appx001024. This reasoning is logical and would make any attempted verification of the respondents' U.S. customers not only "unreasonably onerous," but impossible.

NON-CONFIDENTIAL VERSION

Commerce also explained that the GOC's failures to provide the 2013 revised guidelines for the program rendered verification of the non-use claims unviable. Without current versions of all administrative measures and implementation rules pertaining to the Export Buyer's Credit Program, it is not possible for Commerce to determine the mechanisms through which assistance is provided. Those guidelines likely set forth the "paper trail" required for use of the Program (for example, a sample application). *Id.* Without that information, at any verification, "Commerce would simply not know what to look for behind each loan" in attempting to identify whether it was provided pursuant to the subsidy program. *Id.* As this Court has held, Commerce has the discretion to determine how to conduct its verification, including which entities to verify with respect to which programs. *See Tianjin Mach. Imp. & Exp. Corp. v. United States*, 28 CIT 1635, 1640, 353 F.Supp.2d 1294, 1301 (2004) ("The decision to select a particular {verification} methodology rests solely within Commerce's sound discretion. Moreover, in selecting its verification procedures, Commerce is given 'wide latitude,' and is owed 'considerable deference' by the Court.") (citations omitted). Particularly given Commerce's significant discretion in conducting verification, Yinfeng's

assertions that Commerce should be required to conduct verification without information that the agency has decided it needs is unavailing.

Defendant-Intervenor acknowledges that this Court has remanded several instances where Commerce applied AFA to countervail the Export Buyer's Credit Program. *See* Yinfeng Br. at 11-12. Many of these cases primarily held that Commerce must only explain in sufficient detail its reasoning behind the application of AFA. *See, e.g., Guizhou Tyre Co. v. United States*, 348 F.Supp.3d 1261 (Ct. Int'l Trade 2018). Moreover, this Court has also upheld Commerce's authority to apply AFA under circumstances very similar to those in the underlying investigation and, as Defendant notes, there is no CAFC precedent on this issue. *See Changzhou Trina Solar Energy Co., Ltd. v. United States*, 195 F.Supp.3d 1334 (Ct. Int'l Trade 2016); *RZBC Grp. Shareholding Co. v. United States*, 222 F.Supp.3d 1196, 1199-1203 (Ct. Int'l Trade 2017); Def. Br. at 39.

The law is clear that, when a statute grants an agency power to administer fact-intensive inquires, the agency's conclusion should be reversed only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992). "The reviewing court may not, 'even as to matters not requiring

expertise . . . displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'" *Shandong TTCA Biochemistry Co. v. United States*, 35 CIT 545, 548, 774 F.Supp.2d 1317, 1321 (2011) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). Commerce conducted a thorough examination of the record evidence and determined, after significant analysis, that the information missing from the record was necessary to establish non-use of the Export Buyer's Credit Program. As the finder of fact in its CVD investigations, the agency's findings should not be overturned, even if there is a possibility of drawing another conclusion from the record. *See Consolo*, 383 U.S. at 620 (1966). Thus, the Court should reject Yinfeng's arguments and sustain Commerce's findings.

## C.   Commerce Did Not Err in Calculating the Ocean Freight Benchmark for the Provision of Plywood and Sawnwood for LTAR Subsidy Programs

Commerce properly included Petitioner's data from Descartes in its calculation of the ocean freight benchmark for the provision of plywood and sawnwood for LTAR subsidy programs. Yinfeng's arguments that

reliance on Petitioner's Descartes data was improper are unfounded and should be rejected.

Yinfeng's primary argument is that Petitioner's Descartes rates are "based on a 40 foot, 9'6" high cube container," which it alleges is a "special type of container and costs more to ship." Yinfeng Br. at 32. As in an identical portion of its case brief to the agency, Yinfeng does not explain the basis in the record for its claim. *See id.*; Yinfeng Case Brief at 8-9, Appx028553-Appx028554. As CAMP explained in its benchmark submission and in its rebuttal brief, Petitioner's Descartes data reflected shipments of standard, 20-foot containers. *See* CAMP Benchmark Submission at Exhibit 6, 8, Appx015345-Appx015357, Appx015368-Appx015370; CAMP Rebuttal Brief at 27-28, Appx013291-Appx013292. *See also* Def. Br. at 56. CAMP's Descartes data clearly shows that it reflects shipments of containers with a weight of "28,200 KGS." CAMP Benchmark Submission at Exhibit 6, Appx015345-Appx015357. This is the maximum weight for standard, 20-foot containers. *Id.* at Exhibit 8, Appx015368-Appx015370. Thus, Commerce was correct to reject Yinfeng's argument, IDM at 63, Appx001062, and the Court should do the same.

NON-CONFIDENTIAL VERSION

Yinfeng next argues that CAMP's Descartes data should have been excluded because it included certain weight cargo surcharges and port congestion surcharges, which Yinfeng characterizes as "atypical." Yinfeng Br. at 33. But Yinfeng failed to demonstrate that such surcharges are in fact atypical and not consistent with prevailing market conditions. For example, contrary to Yinfeng's assertion, the "weight cargo surcharge" is not for "overweight" cargo, but is applied on a per metric ton basis regardless of the total weight and thus is not an exceptional charge. *See* CAMP Rebuttal Brief at 28 n.110, Appx01392 (citations omitted). Defendant-Intervenor adopts by reference Defendant's remaining response to Yinfeng on this issue. Def. Br. at 57-60.

Finally, Yinfeng argues that Commerce should have rejected CAMP's Descartes data because the Norfolk to Tianjin route it reflected "is not a major shipping route." Yinfeng Br. at 34. Yinfeng's only apparent support for that characterization is that Norfolk is not one of "the busiest port{s}" in the world. Yinfeng Br. at 34. But, as further explained by Defendant, there is no requirement that freight routes reflect the busiest routes in the world. Rather, they must simply reflect a rate for a commercially

available route that is consistent with prevailing market conditions. *See*
Def. Br. at 60-61. The Court should reject Yinfeng's attempt to apply an
unjustified, higher standard on the agency that differs from the standard
set forth in the statute and regulations, and it should uphold Commerce's
calculation of the ocean freight benchmark.

### D.   Commerce Did Not Err in Calculating the Benchmark for the Provision of Land-Use Rights for LTAR Subsidy Program

Commerce selected an appropriate benchmark for the land-use rights
for LTAR program calculation, and Yinfeng's arguments to the contrary
are unavailing.

Yinfeng argues that Commerce's Thailand CBRE data is based on land
prices for 2010, while its own CBRE Global Rents and MIDA data provide
land values for various years from 2014-2019 and thus are more
contemporaneous with the 2019 POI.[1] However, Commerce adjusted its
Thailand CBRE data for inflation, rendering it more applicable to 2019
land-use prices. IDM at 59, Appx001058. Yinfeng's data – with only one
of its sources covering 2019 and both covering multiple prior years – are
also not perfectly contemporaneous.

---

[1]      Yinfeng mistakenly notes that the POI in this case was 2017; it was calendar
year 2019. IDM at 56, Appx001055.

Moreover, Commerce evaluated all the relevant factors and reasonably found that other factors were more important than contemporaneity in this instance, including a country's proximity to China and level of economic development. IDM at 58-59, Appx001057-Appx001058. Yinfeng's CBRE Global Rents data reflected land prices from locations include Munich, Germany; Sydney, Australia; and Stockholm, Sweden. Yinfeng Benchmark Submission at Exhibit 10, Appx015143-Appx015194; IDM at 59, Appx001058 Obviously, regardless of the year of the data, land prices in, *e.g.*, Sydney, are not comparable to industrial land prices in China. Commerce's finding that these locations "are not reasonable alternatives to China as locations for Asian production" was thus eminently reasonable, clearly justifying the agency's rejection of Yinfeng's Global Rents data. With regard to the MIDA data, Commerce also reasonably found that there was "insufficient evidence of Malaysia's economic comparability to China to select the MIDA data rather than the 2010 Thai CBRE data as a benchmark." IDM at 59, Appx001058. As noted in CAMP's rebuttal brief, Yinfeng's extremely brief analysis regarding the comparability of Malaysian land prices does not compare to the extensive, detailed comparative analysis

undertaken by Commerce in its memorandum setting forth the Thai data, where the agency considered the countries' levels of economic development, *per capita* income, population density, and the level to which the countries competed as production and export platforms for foreign direct investment. *See* Memo from Irene Gorelik to the File, re: *Land Analysis Memo* (June 8, 2020) at 30, Appx020915. In contrast to this extensive analysis, Yinfeng relies heavily on Malaysia's current presence on the list of countries economically comparable to China for surrogate country purposes in antidumping duty ("AD") proceedings. *See* Yinfeng Br. at 37-38. As further explained by Defendant, this CVD proceeding was not governed by Commerce's non-market economy AD investigation framework. *See* Def. Br. at 68. Moreover, that AD determination is based solely on *per capita* gross national income, not the more comprehensive analysis done by Commerce for land benchmarking purposes in CVD proceedings.

In sum, Yinfeng has failed to show that Commerce's land benchmark was unreasonable, and it effectively, and inappropriately, asks the Court to reweigh the evidence and make this factual determination for Commerce. *See Matsushita Elec. Indus. Co. v United States*, 750 F.2d

927, 936 (Fed. Cir. 1984). The Court should reject Yinfeng's challenge to the benchmark selection.

## V.   CONCLUSION

For the reasons above, CAMP respectfully submits that this Court should affirm the final determination of Commerce's CVD investigation into Chinese WMMP as to (1) the determination to apply AFA and countervail the Export Buyer's Credit Program, (2) the inclusion of acrylic polymer under the primer for LTAR program, (3) the calculation of the ocean freight benchmark for the provision of plywood and sawnwood for LTAR programs, and (4) the selection of the benchmark for the provision of land-use rights for LTAR program.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American Millwork Producers*

Dated: December 22, 2021

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Order (Nov. 1, 2021), ECF No. 24 , the undersigned certifies that this brief complies with the word limitation requirement. The word count for Coalition of American Millwork Producers' Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,986 words.

<u>*/s/ Timothy C. Brightbill*</u>
(Signature of Attorney)

<u>Timothy C. Brightbill</u>
(Name of Attorney)

<u>*Coalition of American Millwork Producers*</u>
(Representative Of)

<u>December 22, 2021</u>
(Date)