**Slip Op. 22-107**

**UNITED STATES**
**COURT OF INTERNATIONAL TRADE**

────────────────

**Court No. 21-00088**

────────────────

FUJIAN YINFENG IMP & EXP
TRADING CO., LTD.,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

COALITION OF AMERICAN
MILLWORK PRODUCERS,

*Defendant-Intervenor.*

────────────────

Before: M. Miller Baker, Judge

**OPINION**

[Denying Plaintiff's motion for judgment on the
agency record and granting judgment on the agency
record to Defendant and Defendant-Intervenor.]

Dated: September 13, 2022

*Gregory S. Menegaz*, *J. Kevin Horgan*, *Judith L.
Holdsworth*, and *Alexandra H. Salzman*, deKieffer &
Horgan, PLLC, of Washington, DC, on the briefs for
Plaintiff.

*Brian M. Boynton*, Assistant Attorney General; *Patricia M. McCarthy*, Director; *Claudia Burke*, Assistant Director; and *Ioana Cristei*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, on the brief for Defendant. Of counsel on the brief was *Leslie Lewis*, Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

*Timothy C. Brightbill* and *Laura El-Sabaawi*, Wiley Rein LLP of Washington, DC, on the brief for Defendant-Intervenor.

*Baker*, Judge: Plaintiff Fujian Yinfeng challenges the Department of Commerce's final determination in a countervailing duty investigation of wood mouldings and millwork products from China. For the reasons set forth below, the court sustains that determination.

## Statutory and Regulatory Background

The Tariff Act of 1930 provides that when Commerce determines that a foreign government is providing a "countervailable subsidy" as to goods imported into the United States, and the International Trade Commission further determines that such imports injure U.S. domestic industry, the Department will impose a "countervailing duty" on the relevant merchandise "equal to the amount of the net countervailable subsidy." 19 U.S.C. § 1671(a).

To conclude that a foreign producer received a subsidy, Commerce must determine that "(1) a foreign government provide[d] a financial contribution (2) to a

specific industry and (3) a recipient within the industry receive[d] a benefit as a result of that contribution." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677(5)(B)); *see also* 19 U.S.C. § 1677(5)(A). "Analyzing all three factors is therefore necessary for Commerce to determine whether a [countervailing duty] must be imposed." *Fine Furniture*, 748 F.3d at 1369.

As relevant here, the statute defines "benefit" as including the provision of "goods or services . . . for less than adequate remuneration . . . ." 19 U.S.C. § 1677(5)(E)(iv). The statute further provides that "[f]or purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation or review." *Id.* § 1677(5)(E).

The consideration of "prevailing market conditions" requires an examination of "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.*; *see also Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1374 (CIT 2015). The Department measures the adequacy of remuneration by comparing the respondent's actual price paid for an input to an adjusted benchmark figure representing the market price for the good at issue. *See* 19 C.F.R. § 351.511(a)(2)(i).

In its antidumping and countervailing duty investigations, the Department seeks and relies upon relevant information from interested parties and other sources. Sometimes that information is not available,

and other times an interested party's informational and other responses to the Department's investigation are deficient in some way. The statute provides a tool for Commerce in those situations called "facts otherwise available":

> (a) In general. If—
>
>> (1) necessary information is not available on the record, *or*
>>
>> (2) an interested party or any other person—
>>
>>> (A) withholds information that has been requested by [Commerce] . . . under this subtitle,
>>>
>>> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
>>>
>>> (C) significantly impedes a proceeding under this subtitle, or
>>>
>>> (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
>
> [Commerce] . . . *shall*, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. § 1677e(a) (emphasis added).

If the Department determines that it is required to apply facts otherwise available, it "*may* use an inference that is adverse to the interests of that party in selecting from among" those facts if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." *Id.* § 1677e(b)(1) (emphasis added). An interested party's failure to cooperate to "the best of its ability" is determined by "assessing whether [it] has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

In trade parlance, Commerce's use of an adverse inference in applying facts otherwise available is known as "adverse facts available," or "AFA."[1]

### Factual and Procedural Background

In 2020, in response to a petition from the Coalition of American Millwork Producers, Commerce opened a countervailing duty investigation of millwork products imported from China during calendar year 2019. *See Wood Mouldings and Millwork Products from China: Initiation of Countervailing Duty Investigation*, 85 Fed. Reg. 6513, 6513–14 (Dep't Commerce Feb. 5, 2020). The Department selected Yinfeng as a mandatory respondent. *See* Appx1001, Appx1402.

---

[1] For a more in-depth discussion of the intricacies of adverse facts available, *see Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336–39 (CIT 2020).

Commerce issued initial and supplemental questionnaires to the government of China and Yinfeng. *See* Appx1402. Both responded. *See* Appx5896–10429; Appx11268–11300; Appx5332–5541.

After reviewing this and other information, Commerce published a preliminary determination assessing a 13.61% countervailing duty rate. *See Wood Mouldings and Millwork Products from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 Fed. Reg. 35,900, 35,901 (Dep't Commerce June 12, 2020); Appx 1605–06. Two aspects of its accompanying explanation are relevant here.

First, after repeated stonewalling by the Chinese government, the Department chose to apply facts otherwise available with an adverse inference with respect to China's Export Buyer's Credit Program (EBCP). Appx1414.[2] Commerce chose to do this even

---

[2] Specifically, Commerce determined that it was required to apply facts otherwise available because necessary information was not available on the record, the Chinese government withheld information, and the Chinese government significantly impeded the investigation. Appx1416; *see also* 19 U.S.C. § 1677e(a)(1), (2)(A), (2)(C). Those findings mandated the application of facts otherwise available.

The Department further determined that by withholding information and significantly impeding the investigation, the Chinese government failed to cooperate to the best of its ability. Appx1416; *see also* 19 U.S.C. § 1677e(b)(1). Commerce then exercised its discretion to apply an adverse

though Yinfeng reported no receipt of EBCP benefits and submitted certifications of non-use from its customers. Appx1025, Appx1027.

Second, Commerce selected benchmarks to measure the adequacy of remuneration for the provision of sawnwood and plywood. *See* Appx1428–1434. The lumber inputs are shipped to China, so the Department attempted to establish an ocean freight benchmark price reflective of the world market price in order to determine a fair cost of shipping. *See* Appx1433–1434. As part of this calculation, Commerce relied on an average of all the data submitted by the parties. Specifically, the Department used the Maersk and Descartes freight price datasets submitted by Yinfeng, and the Descartes dataset submitted by the Coalition. Appx1063; Appx1433–1434.

The Department also stated that it could not rely on market or world market benchmark prices to measure the adequacy of remuneration for land-use rights in China. *See* Appx1431–1432. So Commerce instead relied on data from the "Asian Marketview Reports" by CB Richard Ellis (CBRE) for Thailand for 2010 along with inflation data for Thailand. *See* Appx1431–1432.

Roughly contemporaneously with publication of its preliminary determination, Commerce expanded the investigation to include the Chinese government's alleged provision of primer for less than adequate remu-

---

inference in selecting among facts otherwise available. Appx1416.

neration. *See* Appx12167–12172.[3] To that end, the Department requested information to determine whether acrylic polymer could be used as a primer. *See* Appx12938.

In response, the Coalition provided industry definitions and products for sale indicating that acrylic polymers are considered primers. *See* Appx13118–13136. Yinfeng, however, argued that acrylic polymer could not be used as a stand-alone primer and was instead merely a raw material used to make gesso, a type of primer. *See* Appx12944–13091.

Based on the results of this expanded investigation, the Department released a post-preliminary decision memorandum in which it determined that acrylic polymer could be used as a stand-alone primer. *See* Appx1619–1620. Commerce therefore included acrylic polymer purchases in the benefit calculation for the Chinse government's primer program. *Id.*

The Department published its final determination assessing a 20.56% countervailing duty rate. *See Wood Mouldings and Millwork Products from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 67, 68 (Jan. 4, 2021); Appx1394–1395.[4]

---

[3] The Coalition's assertion of this new subsidy allegation prompted the Department's expansion of the investigation to include primer. Appx1608; Appx12070; Appx14743.

[4] Commerce thereafter issued an order imposing the duties specified in its final determination. *See Wood Mouldings*

In its accompanying explanation, as relevant here Commerce continued to apply adverse facts available to China's EBCP for essentially the same reasons as in the Department's preliminary determination. Appx1019–1030.

Commerce also continued to find that acrylic polymer could be used as a primer, and therefore included acrylic polymer purchases in the calculation of the Chinese government's primer subsidy program. Appx1049–1052.

Finally, Commerce again averaged different commercially available world market price datasets provided by Yinfeng and the Coalition, after removing what the Department considered unsupported shipping route estimates from the universe of prices. Appx1005; Appx1061. Relatedly, Commerce also continued to use 2010 Thai prices as reported in the CBRE "Asian Marketview Reports," after adjusting for inflation, as the land-use price benchmark. Appx1056–1058.

Yinfeng then brought this suit under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (B)(i) to contest the Department's final determination. ECF 6. The Coalition intervened to defend that determination. ECF 13. Yinfeng moved for judgment on the agency record.

---

*and Millwork Products from the People's Republic of China: Countervailing Duty Order,* 86 Fed. Reg. 9484–85 (Feb. 16, 20201); Appx1398–1399. The parties have not addressed the extent to which the increase in countervailing duty rate in the Department's final determination resulted from the expansion of the investigation to include primer.

ECF 22; *see* USCIT R. 56.2. The government (ECF 28) and the Coalition (ECF 27) opposed, and Yinfeng replied (ECF 30). As no party requested oral argument, the court decides the matter on the papers.

## Jurisdiction and Standard of Review

The court has subject-matter jurisdiction under 28 U.S.C. § 1581(c).

"[T]he Court of International Trade must sustain 'any determination, finding[,] or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "[S]pecific factual findings . . . are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Substantial evidence is "more than a mere scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

Still, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed.

Cir. 2006) (cleaned up). The court must weigh the entire record and must sustain the Department's determination if the evidence on the record is enough that "a reasonable mind might accept as adequate to support a conclusion." *Atl. Sugar*, 744 F.2d at 1562.

## Discussion

Yinfeng objects to three aspects of Commerce's final determination. First, the company challenges the Department's application of adverse facts available based on the Chinese government's failure to provide information about its EBCP. ECF 22-2, at 5–19. Second, the company argues that substantial evidence does not support the Department's determination that acrylic polymer subsidized by the Chinese government could be used as a primer. *Id.* at 19–30. Finally, Yinfeng objects to Commerce's calculation of the value of shipping rates and land-use values. *Id.* at 30–39.

## I

There is no dispute in this case that the government of China declined to provide information about the EBCP sought by Commerce in its countervailing duty investigation. It is also undisputed, as Yinfeng puts it, that the administrative record "contains no evidence that [the company] or its customers used or benefitted from" that program. ECF 22-2, at 13–14.

Yinfeng argues that Department has not sufficiently justified its application of facts otherwise available based on the Chinese government's stonewalling, characterizing (without any further elaboration) Commerce's explanation as a "vague claim." ECF 22-2,

at 14. The company relies on several decisions where this court has rejected Commerce's application of adverse facts available based on the withholding of information about the EBCP. *See, e.g.*, *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1359–60 (CIT 2019) (holding that Commerce "failed to say how the information it sought" concerning the EBCP "is necessary" to determine "whether the manufacture, production, or export" of the imported merchandise "has been subsidized").

*Clearon* and similar decisions by this court recognize that the statute does not allow the Department to apply facts otherwise available merely because "information is not available on the record." *See Clearon Corp. v. United States*, 474 F. Supp. 3d 1339, 1353 (CIT 2020) ("[I]t is not clear that any of the missing information was 'necessary' . . . ."). The missing information must be "*necessary*," meaning at least reasonably related to the subject of the investigation such that "the missing information actually created a gap that mattered." *Id.*; *see also* 19 U.S.C. § 1677e(a)(1).

Similarly, the statute does not allow Commerce to apply facts otherwise available merely because an "interested person" has withheld information requested by the Department, 19 U.S.C. § 1677e(a)(2)(A); failed to provide "such information" in a timely manner or in the format requested by Commerce, *id.* § 1677e(a)(2)(B); "significantly" impeded a proceeding, *id.* § 1677e(a)(2)(C); or provided "such information" but it was unverifiable, *id.* § 1677e(a)(2)(D). The common thread to each of these possible grounds for applying facts otherwise available is that both the "information"

requested by the Department and the "proceeding" for which the information is sought must be "*under this subtitle.*" *Id.* § 1677e(a)(2)(A), (C) (emphasis added).

Therefore, if Commerce engages in a fishing expedition for information that is beyond the scope of its regulatory jurisdiction or not reasonably related to the proper subject of its investigation, the application of facts otherwise available is unlawful. *Cf. Dalian Meisen Woodworking Co. v. United States*, 571 F. Supp. 3d 1364, 1377 (CIT 2021) (Commerce's request that a respondent explain why it lied to its U.S. customers was not made "under this subtitle" and thus "exceeded [the Department's] regulatory writ"). It's thus incumbent upon Commerce to explain how an interested party's asserted deficiencies under 19 U.S.C. § 1677e(a) properly relate to an antidumping or countervailing duty investigation.

Here, Commerce explained at length why the missing information it sought was necessary to confirm EBCP non-use by Yinfeng's customers. For example, the Department explained that in 2013 the Chinese government had modified the program in various ways, including possibly by eliminating a $2 million minimum business contract requirement for the provision of the EBCP loans. Appx1020. The status of this requirement was "critical" to the Department's understanding of the program, because "if the program is no longer limited to $2 million contracts, this increases the difficulty of verifying loans without any such parameters." Appx1021. In the absence of this $2 million filter, Commerce would have to examine all loans received by Yinfeng's U.S. customers.

Commerce further explained that the 2013 changes appeared to have modified the EBCP in various ways, including by the disbursement of loans to foreign customers through intermediary banks. Appx1021. The Department therefore asked the Chinese government to provide a list of all partner banks involved in disbursement of EBCP funds. *Id.* Commerce needed that information because those bank names, "not the name 'China Ex-Im Bank,'" would "appear in the subledgers of the U.S. customers if they received the credits." Appx1023. This list of banks was thus "critical for [the Department] to perform verification at the U.S. customers." Appx1024.

But even the list of participating banks was only a starting point. The Department explained that it needed to know EBCP loan documentation requirements to look for "indicia of China Ex-Im involvement." Appx1024. Absent an understanding of those requirements, Commerce could not "verify which loans were normal loans versus EBC[P] loans." *Id.*

In short, Commerce reasonably explained that absent the EBCP information it requested from the Chinese government, the Department's attempt to verify whether Yinfeng's U.S. customers were EBCP recipients (and thus the beneficiaries of subsidies) amounted to "looking for a needle in a haystack with the added uncertainty that Commerce might not even be able to identify the needle when it was found." Appx1025.

Yinfeng responds to these points by noting that the Chinese government claims to have searched official

records to confirm that none of the company's custom-ers received EBCP credits during the period of inves-tigation. ECF 22-2, at 9. But this representation by the Chinese government failed to provide any documenta-tion to show on what basis the purported search was conducted—or even if it really was. Appx1415.[5]

The Department's thorough explanation of exactly why the missing information was necessary to verify EBCP non-use distinguishes this case from other cases where this court has held that Commerce failed to properly explain the need for the absent information. *See, e.g.*, *Clearon*, 474 F. Supp. 3d at 1353 (holding af-ter remand that substantial evidence did not support applying adverse facts available where Commerce did not analyze whether the missing information actually impacted its ability to verify).

Accordingly, substantial evidence supports Com-merce's application of facts otherwise available due to the Chinese government's stonewalling and impeding the investigation. Substantial evidence also supports the Department's determination to apply an adverse inference in selecting that information because of that government's failure to cooperate. *Cf. Fine Furniture*, 748 F.3d at 1373 (upholding the application of adverse facts available based on, *inter alia*, the Chinese gov-ernment's failure to provide requested information and cooperate with the Department's investigation).

---

[5] Commerce understandably doesn't take the Chinese gov-ernment's representations on faith.

## II

Yinfeng argues that Commerce's determination that acrylic polymer can be used as a stand-alone primer is not supported by substantial evidence. ECF 22-2, at 23–27.[6] The company points to certifications by its affiliate[7] and the relevant supplier that acrylic polymer could not be used as a primer or paint. *Id*. at 25. It further points to third-party information that acrylic polymer "on its own is a chemical binder and must be further processed to be used as a primer" such as acrylic gesso. *Id*. at 26. It notes that the Harmonized Tariff Schedule (HTS) classifies acrylic polymer under chapter 39 rather than the relevant chapters for paint (32) and plasters (25). *Id*. at 27.

The Coalition, however, provided industry definitions and products for sale indicating that single-

---

[6] Yinfeng also argues at length that Commerce's inclusion of acrylic polymer in the primer program investigation unlawfully expanded the scope of the Department's investigation, ECF 22-2, at 19–22, and in so doing departed from past practice and World Trade Organization standards, *id*. at 28–30. The company does not dispute, however, that Commerce properly undertook the primer investigation in response to the Coalition's new subsidy allegations. Nor does the company dispute that if substantial evidence supports Commerce's determination that acrylic polymer *can* be used as a stand-alone primer, the Department properly included the subsidized acrylic polymer in calculating countervailing duties. Hence, the dispositive question is whether substantial evidence supports that factual determination; Yinfeng's other arguments are irrelevant.

[7] Yinfeng's affiliate Mangrove purchased the acrylic primer in question.

ingredient acrylic polymers, such as those purchased by Yinfeng's affiliate, are considered primers by industry standards and are used as primers in practice. Appx1049, Appx1619.

Commerce weighed this evidence and agreed with the Coalition. Appx1049–1052. In so doing, the Department explained why it discounted Yinfeng's evidence and credited the Coalition's.

First, in response to the Department's inquiries, the company only discussed its affiliate's processing of acrylic polymers to manufacture gesso and provided no factual support for its contention that the acrylic polymers its affiliate purchased could *not* be used a stand-alone primer. Appx1049.

Second, the HTS classifications invoked by Yinfeng only established that the acrylic polymer purchased by its affiliate was not classified as paint. Appx1050.

Third, the Customs rulings provided by Yinfeng established that the HTS classification applicable to acrylic polymers could include both granular inputs *and* finished products that could be used as primers. *Id.*

Finally, none of the third-party sources submitted by the company established that acrylic polymers could *never* be used without further processing. *Id*.

This weighing of the evidence suffices to provide substantial evidence to support Commerce's final determination that acrylic polymer can be used as a stand-alone primer. Yinfeng's arguments show at most

that the Department could possibly have reasonably reached a contrary conclusion. But the substantial evidence standard requires "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). The Department's determination must be sustained so long as it is supported by substantial evidence—as, here, it was.

III

After its investigation, Commerce averaged all freight routes on the record to establish a world market benchmark for ocean freight pursuant to 19 C.F.R. § 351.511(a)(2)(ii). Appx1060–1062. These benchmarks were used for countervailing duty calculations in Commerce's final determination. *See* Appx1059–1064.

Yinfeng argues that Commerce should have relied solely on its submissions for ocean freight calculations, and ignored datasets submitted by the Coalition, because—according to Yinfeng—the Coalition's datasets are not appropriately comparable to the routes that Yinfeng uses. *See* ECF 22-2, at 30–34. Specifically, Yinfeng argues that the Coalition's Descartes data submitted based on a route from Norfolk, Virginia, to Tianjin, China, were improperly calculated. Allegedly, the data use the wrong size container, contain atypical charges, and focus on a non-major shipping route because "Norfolk is not a major world port." *Id.*

As in other aspects of this case, this court "must sustain 'any determination, finding[,] or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.' " *Fujitsu*, 88 F.3d at 1038 (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). And while substantial evidence remains the standard, this court grants the Department "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Id.* at 1039. Particularly regarding technical matters, it is not the role of this court to "weigh the adequate quality or quantity of the evidence for sufficiency." *Timken Co. v. United States*, 699 F. Supp. 300, 306 (CIT 1988).

Here, the record shows why the Department reasonably relied on data from the Norfolk-to-Tianjin route. Commerce found no evidence that it contained surcharges inconsistent with market conditions, that the route was inappropriate, or that it had an unusual shipping rate. Appx1062. That weighing and explanation by the Department suffices for substantial evidence purposes.

Yinfeng also challenges the Department's use of 2010 Thai data to calculate the cost of land. The company argues that these data are too old and that Thailand is not economically comparable to China. ECF 22-2, at 34–39. Yinfeng argues that Commerce instead should have relied upon more recent price data in the record from Malaysia, especially when the

Department has found that nation comparable to China in antidumping proceedings. *Id*. at 37–39. Yinfeng also argues that another option was global data from CBRE. *Id*.

The Department explained it adjusted the Thai data for inflation, Appx1058, and that it viewed Thailand as more economically comparable to China than Malaysia under its regulatory criteria such as population density and producers' perceptions. *Id*. Moreover, Yinfeng's characterization of the Malaysia as economically comparable failed to consider those criteria. As far as the global CBRE data referred to by Yinfeng, the Department noted that it included data from several countries that were not reasonable alternatives to China, such as Germany. *Id*.

There is no doubt Commerce could have calculated the land cost benchmark differently, as Yinfeng argues. But Yinfeng must show more than this to overcome the deference due to Commerce on a highly technical matter. *See generally Fujitsu*, 88 F.3d at 1038–39. Yinfeng has not met this burden, nor has Yinfeng shown that its preferred benchmarking approaches would be free of other problems. In view of the deference the court owes to the Department on this most technical subject, the court sustains the land benchmarking approach used in Commerce's final determination.

## Conclusion

It's easy to read this record and be sympathetic to Yinfeng. The company is disadvantaged by an adverse

inference caused by the noncooperation of the Chinese government over which it has no control, an expanded investigation into a product Yinfeng argues can't be used as a primer in the first place, and benchmarks that could easily have been calculated differently.

But it isn't the court's job to micromanage the Commerce Department, whose challenged determinations here are reasonable and supported by substantial evidence. The court therefore denies Yinfeng's motion for judgment on the agency record, sustains the final determination, and grants judgment on the agency record to the government and the Coalition. *See* USCIT R. 56.2(b). The court will enter a separate judgment. *See* USCIT R. 58(a).

Dated:  September 13, 2022           /s/ *M. Miller Baker*
         New York, New York          Judge